**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CHICAGO TITLE LAND TRUST COMPANY, as Successor Trustee for LaSalle Bank National Association, as Trustee under Trust Agreement, dated 11/01/94, and known as Trust #119089; and STEVEN W. BECKER, THOMAS J. BECKER, and JEFFREY C. BECKER, as Beneficiaries of Chicago Title Land Trust Company, as Successor Trustee for LaSalle Bank National Association, as Trustee under Trust Agreement, dated 11/01/94, | ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 24 CV 3409 **JURY TRIAL DEMANDED** |
| Plaintiffs, | ) ) | |
| -vs- | ) ) | |
| PARKER CONCRETE PLACEMENT, INC.; PARKER CONCRETE PUMPING INC.; BRIAN PARKER; and AUBREY PARKER, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT

NOW COME Plaintiffs, CHICAGO TITLE LAND TRUST COMPANY, as Successor Trustee for LaSalle Bank National Association, as Trustee under Trust Agreement, dated 11/01/94, and known as Trust #119089, and STEVEN W. BECKER, THOMAS J. BECKER, and JEFFREY C. BECKER, as Beneficiaries of Chicago Title Land Trust Company, as Successor Trustee for LaSalle Bank National Association, as Trustee under Trust Agreement, dated 11/01/94, and known as Trust #119089, by their undersigned counsel, and complain

1

against PARKER CONCRETE PLACEMENT, INC., PARKER CONCRETE PUMPING INC., BRIAN PARKER, and AUBREY PARKER.  In support thereof, the Plaintiffs allege as follows:

## PRELIMINARY STATEMENT

1.   This action is brought pursuant to the citizen-suit provision of the Resource Conservation and Recovery Act (hereinafter "RCRA"), 42 U.S.C. § 6972(a)(1)(B), in response to the Defendants generating and contributing to the disposal of solid or hazardous waste that may present an imminent and substantial endangerment to human health or the environment, as well as related Illinois state law claims.  These claims arise as a result of Parker Concrete's illegal industrial operations on an agricultural site whereby a fleet of cement pump trucks was regularly washed over a period of five years, thereby generating and dumping a toxic slurry of cement wastewater, including the water-soluble carcinogen Chromium 6 (Hexavalent Chromium), directly into the soil and groundwater over an environmentally sensitive location.  This illegal disposal scheme was engaged in by Parker Concrete intentionally or with a reckless disregard for cement industry standards that require that all concrete wastewater be collected and maintained in leak-proof containers or basins "so that this caustic material does not reach the soil surface and then migrate to surface waters or into the ground water."  Because Parker Concrete's disposal activities pose a substantial present or potential hazard to Plaintiffs' health, the water supply, and the environment, and no forensic testing has been done on the site, the Plaintiffs seek mandatory and prohibitory injunctive relief under the RCRA, as well as damages under state law.

2.   In an effort to eliminate evidence of Parker Concrete's illegal disposal activities and in retaliation for Plaintiffs' objections to Parker Concrete's illegal operations and their successful opposition to Defendants' attempts to industrialize the neighborhood, Brian Parker and Aubrey

2

Parker (hereinafter the "Parker Defendants") retaliated with mob-style tactics meant to threaten and intimidate Plaintiffs. After Plaintiffs sent the Defendants both Clean Water Act and RCRA Notice of Intent (hereinafter "NOI") to sue letters, as required by statute, Defendants, working in conspiracy, engaged in a course of conduct that included threats, intimidation, repeated acts of trespass, impersonating surveyors, removal of historic property monuments, attempts to steal Plaintiffs' farmland, removal of and damage to Plaintiffs' trees and bushes, illegal camera and drone surveillance, an attempt to have Plaintiff Steven Becker's law license revoked so the Defendants could not be sued, a vehicular assault on Plaintiffs' surveyor, and the placement of a deadly weapon in the wheel path of Plaintiffs' private driveway meant to cause serious bodily harm or death. Said acts by Defendants were initiated by Defendants to eliminate evidence of illegal disposal activities and to intimidate and deter Plaintiffs from pursuing the instant litigation.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 6972(a). This Court has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367(a).

4. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2). A substantial part of the events or omissions giving rise to the claims occurred in this district and all of the property that is the subject of this action is situated in this district.

## PARTIES

5. Plaintiff CHICAGO TITLE LAND TRUST COMPANY, as Successor Trustee for LaSalle Bank National Association, as Trustee under Trust Agreement, dated 11/01/94, and

known as Trust #119089, owns a 20-acre parcel of land (Property PIN #18-13-13-300-010-0000) in Will County, Illinois, as trustee.

6.   Plaintiffs STEVEN W. BECKER, THOMAS J. BECKER, and JEFFREY C. BECKER, (hereinafter the "Beckers") as Beneficiaries of Chicago Title Land Trust Company, as Successor Trustee for La Salle Bank National Association, as Trustee under Trust Agreement, dated 11/01/94, and known as Trust #119089, are the beneficial owners.

7.   Defendant PARKER CONCRETE PLACEMENT, INC. (hereinafter "Parker Concrete"), is an active domestic BCA corporation, domiciled in the State of Illinois, incorporated on June 21, 2006. According to the business website, it is located at 21w171 Hill Ave., Glen Ellyn, IL 60137. Brian Parker is listed as the President and Secretary of Parker Concrete Placement, Inc. with an address at 7608 W. Monee-Manhattan Road, Monee, IL 60449. Brian Parker is also listed as its Registered Agent at 1109 Hill Ave., Glen Ellyn, IL 60137-4012.

8.   Defendant PARKER CONCRETE PUMPING INC. (hereinafter "Parker Concrete") is an active domestic BCA corporation registered in the State of Illinois, incorporated on November 7, 2022. According to the business website, it is located at 21w171 Hill Ave., Glen Ellyn, IL 60137. Brian Parker is the President and Registered Agent of Parker Concrete Pumping Inc., with an address of 1109 Hill Ave., Glen Ellyn, IL 60137-4012.

9.   The relationship between Defendants Parker Concrete Placement, Inc. and Parker Concrete Pumping Inc. is presently unknown. Therefore, throughout this complaint these two corporate entities, which are not distinguishable or listed by their corporate titles on Parker's business website, will be referred to collectively as "Parker Concrete".

10. Defendant BRIAN PARKER (hereinafter "Parker") is the owner of two adjoining parcels

of land, Property Pin Nos. 18-13-13-300-014-0000 (14.9 acres) and 18-13-13-300-013-0000 (24.52 acres), both with a listed mailing address at 7608 W. Monee-Manhattan Road, Monee, IL 60449.

11. Defendant AUBREY PARKER is the adult daughter of Brian Parker, who occasionally resides and/or works at 7608 W. Monee-Manhattan Road, Monee, IL 60449.

## STATEMENT OF FACTS

**Historical Background**

12. In 1974, Plaintiffs' family purchased farmland (Property PIN #18-13-13-300-010-0000) and built a home and farmstead at 7600 W. Monee-Manhattan Road, Monee, IL 60449, in Green Garden Township, Monee, IL, 60449. *See* Exhibit A, top photo.

13. In the late 1990s, with the introduction of high-density and commercial development into rural Green Garden Township, local neighbors recognized the need to become advocates to preserve their rural quality of life and natural resources.

14. In 2003, to advocate for stream and wetland preservation during local subdivision development, the Beckers and their neighbors organized the Upper Forked Creek Watershed Committee, a volunteer organization.

15. Forked Creek, a tributary of the Kankakee River, is Will County's largest stream system, providing drainage for almost 90,000 acres.

16. Forked Creek's high biotic integrity was established by a 2003 Illinois Department of Natural Resources (hereinafter "IDNR") survey, which Plaintiff Thomas Becker participated in, identifying 19 varieties of fish spawning in the stream headwaters.

17. With guidance from the Openlands conservation organization, the Beckers and 17 rural

5

families also initiated a Neighborhood-Based Habitat Enhancement Plan for Upper Forked Creek, which included maintaining a continuous creek habitat system, restoring wetland corridors, minimizing and eliminating chemicals and pollutants that could impair Forked Creek, maintaining pastured buffers along the creek channel and stormwater patterns, as well as plantings of thousands of trees.

18. The Forked Creek Watershed Committee and/or its members actively participated in local zoning matters regarding commercial and subdivision development, as well as participating in the process of Will County's revision of subdivision and natural resource ordinances, which were codified in 2010.

19. Plaintiffs have sustained their farm organically for 50 years, never adding chemical fertilizers, herbicides or pesticides in raising livestock and poultry, in growing extensive gardens for vegetables, fruits and flowers, and they believe in environmental stewardship.

**Defendant Parker Purchases Land Adjoining Becker Farm in 2017**

20. In 2017, Defendant Parker purchased the 14.19-acre agriculturally-zoned property, Property Pin #18-13-13-300-014-0000, with a home and pole building located at 7608 W. Monee-Manhattan Road, Monee, IL 60449 in Green Garden Township.

21. Defendant Parker informed Plaintiffs that he purchased this acreage so that he could have a horse farm.

22. In 2018, Defendant Parker purchased the 25.42-acre agriculturally-zoned farmland, Property Pin #18-13-13-300-013-0000, adjacent to his 14-acre parcel.

23. Both of the parcels purchased by Defendant Parker are located directly north and uphill from Plaintiffs' farm. *See* Exhibit A, top photo.

24. The stormwater pattern from Parker's property drains downhill with a decline of approximately 25-feet in elevation traveling directly into the Beckers' organic farm.

25. According to USDA Soil Maps, Parker's parcel includes farmed wetlands, identified as Bryce 235A hydric soils, and the same wetland soil pattern extends into the Becker farm. *See* Exhibit A, bottom photo.

26. According to the US Fish and Wildlife Service National Wetlands inventory map, Parker purchased land which also includes an inventoried wetland along the north and east portion of his 14-acre parcel.

27. According to the ISGS map of Illinois Groundwater Resources, Defendant Parker's properties sit entirely above a shallow, sand and gravel aquifer. *See* Exhibit A, center photo.

28. This aquifer provides drinking water for the wells of local families, offering a precious fresh water supply for three square miles of Green Garden Township residents.

29. Known as a water-table aquifer, this sand and gravel aquifer is so shallow that it is recharged by rainstorms and is located within hydric soils, where groundwater can be a foot or less below the surface.

30. Stormwater patterns from Defendant Parker's property descend north and also southeast into two nearby headwaters of Forked Creek. *See* Exhibit A, bottom photo.

31. The Forked Creek headwaters are not only fed by rainfall but are maintained for aquatic life by the contribution of local groundwater.

32. The groundwater of this aquifer feeds and sustains Upper Forked Creek, and contamination of the groundwater will contaminate the stream.

33. The shallow aquifer provides Plaintiffs with two water wells used for drinking, cooking,

7

the raising of organic food, and flower production.

34. During heavy storms, the aquifer water table of this shared wetland acreage is at the surface and is virtually indistinguishable from groundwater.

**Defendant Parker Prepares Rural Site for Industrial Operation**

35. In 2018, Defendant Parker asked Tom and Jeff Becker to come to his yard to help him identify the trees/bushes on his new property.

36. During that visit, when Defendant Parker inquired about why there is an unusually wet area west of his pole building, Plaintiff Tom Becker explained that the wet area was part of a stormwater pattern that drains directly downhill and into the Becker farm.

37. By July 2018, Parker had three large bay doors installed on the west side of the former owner's white pole building.

38. On January 6, 2019, Plaintiffs hosted a brunch at their home for Defendant Parker, so he could meet neighbors who also owned horses, as he stated his intention of making a horse farm on his newly acquired land.

39. By January 2019, Defendant Parker installed foam insulation and new lighting in his pole building.

40. On April 12, 2019, Plaintiffs' driveway was obstructed by debris from someone cutting down trees/bushes along the area near the mutual driveway entrances.

41. Defendant Parker told Plaintiffs that a hired operator had mistakenly taken down the Beckers' trees/bushes using a rotary brush cutter.

42. Soon thereafter, Defendant Parker's son, Cameron, let slip that the equipment operator was actually his father, Brian Parker.

8

43. Fortunately, the majority of the Beckers' trees and bushes grew back as their root stock remained intact.

44. The purpose of Defendant Parker opening up the area was to make way for Parker Concrete cement trucks to enter and leave his property.

45. In April 2019, Plaintiffs observed Defendant Parker with a skid steer add large amounts of gravel fill to the west and north sides of his pole building to greatly expand the former owner's gravel area.

46. On July 13, 2019, Parker had a cement slab laid as a new foundation for the old pole building.

47. Shortly after July 13, 2019, Defendant Parker showed Plaintiff Tom Becker the newly poured concrete slab, which he said was for an indoor horse-riding arena for his daughters.

48. At that time, Plaintiff Tom Becker asked Parker if he had installed plumbing or sewers for the floor drains located in the cement slab and was told that no plumbing was added and that the floor drains in the pole building discharge directly into the soil.

49. In early September 2019, while Plaintiff Tom Becker was leaving Parker's property, he observed a cement pump truck come down Parker's driveway.

50. On that occasion, Defendant Parker rushed over to Tom Becker and explained that the cement truck was only on his property due to a "rare emergency".

51. On September 20, 2019, an accident occurred on Monee-Manhattan Road, where an automobile had a collision with a Parker Concrete pump truck, while the large truck was trying to navigate a turn into Parker's narrow driveway entrance.

52. On October 18, 2019, Plaintiff Tom Becker walked from his property to the Parker house

to bring cupcakes to Parker's family, due to the unexpected passing of Parker's office dispatcher and secretary, Lisa Murphy, who was working for Parker Concrete out of Parker's house.

53. During that visit, when Plaintiff Tom Becker walked through Parker's gravel yard near his pole building, he noticed that the gravel yard was saturated with pools of water, despite no rain event between October 13-19, 2019.

54. In the Fall of 2019, Plaintiffs began seeing Parker Concrete cement trucks arrive at Parker's property, being maintenanced, washed, and/or stored in his pole building or stored outside overnight, for dispatch the following day.

55. Before Thanksgiving 2019, Plaintiff Tom Becker walked up to Parker's property to give him a coffeecake for the Holiday and observed the pole building with the three bay doors open, with each bay filled with a large cement pump truck.

56. At that time, Defendant Parker gave Plaintiff Tom Becker a tour of the pole building with the cement trucks inside.

57. Defendant Parker boasted to Tom Becker that he owned a fleet of these expensive pump trucks, which necessitated washing after each use to prevent cement from hardening on the vehicles.

58. At that visit, Defendant Parker told Plaintiff Tom Becker that his business, Parker Concrete, operated in the tri-state area, which included Illinois, Indiana, and Wisconsin, and he had industrial yards in both Glen Ellyn, IL and Hammond, IN.

59. During that same visit, Defendant Parker explained to Plaintiff Tom Becker that the storage of these cement trucks in his pole building was only temporary for storage that Winter.

**Parker Concrete's Illegal Operations in 2020 at Rural Site**

60. By February 2020, the regular dispatch and noisy washing of Parker Concrete pump trucks at the rural 7608 W. Monee-Manhattan Road location became a concern to the residents of the previously quiet rural neighborhood.

61. Parker Concrete's cement truck washings were so loud they could be heard inside Plaintiffs' home, approximately 1,000-feet away.

62. The annoying and repetitive pounding of a metal rod on the Parker Concrete cement truck booms to dislodge cement was so noticeable that it was heard by neighbors living 3/4 of a mile away from Parker's industrial activity.

63. At that time, Plaintiffs would regularly observe the vehicles of Parker Concrete employees, who drove and operated the pump trucks, arrive early in the morning, park during the day, and then disappear in the afternoon or evening.

64. By the Spring and Summer of 2020, Plaintiffs observed Parker's farm property converted into a fully functional industrial dispatch and storage yard.

65. This included Parker Concrete employees regularly coming and going, Parker's home used as the Parker Concrete dispatch office with a secretary onsite, an employee parking lot with parking bumpers visible from the Beckers' driveway, 3-4 cement trucks being dispatched a day, the washing of cement trucks often for a duration of 45 minutes per truck and washing as late as 12:30 a.m., onsite truck maintenance, with truck dispatch taking place within a 20-hour window on weekdays, weekends, and holidays.

66. Defendant Parker's pole building regularly had its large three bay doors wide open showing up to three cement trucks parked inside, sometimes with a fourth cement truck stored

outdoors overnight.

67. On or about April 7, 2020, Plaintiff Tom Becker filed his first complaint with the Will County Land Use Department to stop Parker Concrete's illegal commercial operations on this agriculturally zoned parcel.

68. As complainants filing Will County Land Use Code Enforcement actions are anonymous, Defendant Parker would not have been aware which neighbor(s) had filed complaint(s) against him.

69. On April 7, 2020, the case against Brian Parker, 20 LU00173, was assigned to Code Enforcement officer Megan Flanagan (l/k/a Megan Rockett, hereinafter "Flanagan-Rockett"), who later explained to Tom Becker that code enforcement officials were not going out to businesses or residential homes at the time, due to the COVID pandemic.

70. On April 12, 2020, Easter Sunday, Plaintiffs Tom and Jeff Becker heard the loud sounds of a Parker Concrete pump truck being washed and maintenanced.

71. That afternoon, Plaintiff Tom Becker photographed Parker's 45-meter blue pump truck with its boom outstretched at Parker's gravel yard on the rural site.

72. During the Spring/early Summer of 2020, Defendant Brian Parker mentioned to Tom and Jeff Becker that these large trucks come with service warranties, and that they might see a mechanic outdoors fixing one of his trucks.

73. Defendant Parker also told Tom and Jeff Becker that he hires a number of driver operators who transport the pump trucks to and from work sites.

74. During the Summer of 2020, Plaintiff Tom Becker was introduced to several of Parker Concrete's driver operators, and Plaintiffs noticed that Defendant Parker and his employees were

regularly seen wearing knee-high rubber boots and protective clothing.

75. On June 8, 2020, Plaintiff Tom Becker texted Flanagan-Rockett that Parker Concrete was dispatching up to 5 cement pump trucks a day from the rural site, and Parker's employee parking lot was regularly filled with the parked cars of the truck drivers.

76. On June 8, 2020, Flanagan-Rockett responded that no onsite inspections were being done due to the current rioting and protests.

77. On June 22, 2020, Plaintiff Tom Becker photographed employee vehicles onsite in Parker's employee parking lot.

**1st Will County Code Enforcement Violation Notice Sent to Parker Concrete**

78. On June 30, 2020, Flanagan-Rockett's log noted: "I was able to view large work trucks coming and going from this property this week. I am sending a violation notice explaining that depending on the business they are currently running has to have a SUP per their zoning of A-1. V1 notice being sent."

79. On June 30, 2020, Defendant Brian Parker was sent his first violation notice from the Will County Land Use Code Enforcement Division, Case # 20LU00173, where he was cited for a violation of Ordinance 155-7.20-D, noting that "[i]t is a prohibited use to run a cement business from your property based on your Zoning District of A-1. You are required to come into compliance with our department."

80. On July 7, 2020, Plaintiff Tom Becker texted Flanagan-Rockett that there was a cement pump truck on the west side of Parker's pole building, and that Parker's employee parking lot was full.

81. At that time, Flanagan-Rockett recommended that Plaintiffs not take photographs in order

to preserve their anonymity.

82. On July 8, 2020, Plaintiff Tom Becker texted Flanagan-Rockett that there was a large cement truck onsite and a vehicle in employee parking.

83. Later that day, Plaintiff Tom Becker reported to Flanagan-Rockett that there were two cement trucks outside in Parker's yard, along with several vehicles in employee parking.

84. On July 8, 2020, Flanagan-Rockett's log remarked: "The owner of this property called me in regards to the letter he received. He advised that no work is done on the property and that he brings back his work trucks and stores them there...."

85. On July 9, 2020, Plaintiff Tom Becker texted Flanagan-Rockett that two cement trucks were parked outside, and there were four vehicles in Parker's employee parking lot.

86. On July 10, 2020, Plaintiff Tom Becker texted Flanagan-Rockett that there were two cement pump trucks onsite, as well as several vehicles in employee parking.

87. On July 13, 2020, Plaintiff Tom Becker texted Flanagan-Rockett that there were six vehicles in the employee parking lot, and one cement truck at the property.

88. On July 13, 2020, in a second text, Plaintiff Tom Becker texted Flanagan-Rockett that there were now four parked cement trucks onsite, as well as three vehicles in employee parking.

89. On July 14, 2020, Plaintiff Tom Becker texted Flanagan-Rockett that there was one cement truck still left on the property and three vehicles in employee parking.

90. On July 14, 2020, Plaintiff Tom Becker also wrote Flanagan-Rockett that he learned on July 13, 2020, that a neighbor was almost hit at a rural intersection by a Parker Concrete cement pump truck barreling through a stop sign.

91. On July 15, 2020, Plaintiff Tom Becker texted Flanagan-Rockett that there was one

cement truck onsite, as well as three vehicles in employee parking.

92. On July 16, 2020, Plaintiff Tom Becker texted Flanagan-Rockett that there were four driver vehicles in employee parking, but no cement trucks present.

93. On July 17, 2020, Plaintiff Tom Becker texted Flanagan-Rockett that there were three driver vehicles in employee parking on Parker's property.

94. On July 20, 2020, Plaintiff Tom Becker texted Flanagan-Rockett that there were five vehicles in the employee parking lot, two cement trucks onsite, and that he heard the sound of noisy mechanic repairs and truck washings.

95. Plaintiff Tom Becker's July 20, 2020 text further noted that on Saturday, July 18, 2020, there were four vehicles in employee parking, as well as one cement truck at the Parker property.

96. On July 21, 2020, Plaintiff Tom Becker texted Flanagan-Rockett that there were noisy truck washings and mechanic repairs, and there was one cement truck onsite and one driver vehicle in employee parking.

97. On July 23, 2020, Plaintiff Tom Becker texted Flanagan-Rockett that there were two driver vehicles in employee parking and one cement pump truck onsite, and that on July, 22, 2020 there were four driver vehicles in employee parking and one parked cement pump truck.

98. On July 23, 2020, Plaintiff Tom Becker wrote the following text to Flanagan-Rockett: "Mr. Parker said he has 9 or 10 of these pump trucks, the large ones costing about a million dollars each. When he is running four drivers a day here, that's about half of his fleet being dispatched, power-washed & repaired from this property."

99. On July 24, 2020, Plaintiff Tom Becker texted Flanagan-Rockett that there were three vehicles in employee parking and two cement pump trucks onsite at the rural property.

15

100.     On July 24, 2020, Flanagan-Rockett texted Plaintiff Tom Becker that the owner called her and is setting up a Pre-App meeting - so they can tell him what he can and cannot do.

101.     On August 17, 2020, Plaintiff Tom Becker texted Flanagan-Rockett to request a status on the Parker matter and also complained about the truck noise.

102.     On August 20, 2020, Flanagan-Rockett and other members of the County Land Use Department had a Pre-Application meeting with Defendant Brian Parker.

103.     On August 20, 2020, Flanagan-Rockett's log noted the following: "The Pre-App meeting was heard today at 3:30pm, it was stated in the meeting that we determined Mr. Parkers cement business as a commercial business with the 4 commercial vehicles that come and go on the property, this is not allowed per A-1, this zoning also doesn't allow Mr. Parker to apply for any Special Permits.  He can apply for a Map Amendment to rezone the property to Commercial or Industrial but then he cannot live in his residence…"

104.     According to the Will County Land Use Department Pre-Application Meeting summary dated August 20, 2020, the staff summary specifically indicated that as Parker's property is located in close proximity to agricultural, estate, and residential zoned parcels, it is only suitable for continuing in use as either an agricultural or residential parcel.

105.     The August 20, 2020 staff summary also indicated that there was no highway commercial district or industrial zoning district located within a half-mile of Parker's property, making a zoning change to commercial or industrial inappropriate for this location.

**2nd Will County Code Enforcement Violation Notice Sent to Parker Concrete**

106.     On August 30, 2020, Flanagan-Rockett issued a 2nd violation notice to Brian Parker in Case # 20LU00173, wherein she updated the corrective action from her 1st violation

notice as follows: "It is a prohibited use to run a commercial business from your property based on your Zoning District of A-1.  It has been determined by our department and was stated during our Pre-Application meeting that you are in fact running a commercial business from your residence.  You are required to come into compliance with our department and cease all commercial related activity on the property."

107.    On August 31, 2020, Flanagan-Rockett texted Plaintiff Tom Becker and stated that they had advised Parker that he is running a commercial business which is not allowed and that she had filed a 2nd violation notice.

108.    On October 27, 2020, Flanagan-Rockett texted Plaintiff Tom Becker and asked for an update as to whether Parker's commercial truck traffic had decreased or stopped.

109.    On October 27, 2020, Plaintiff Tom Becker responded to Flanagan-Rockett that cement truck activity was quiet in September, but cement truck activity had resumed recently, noting that on October 20, 2020 he was informed by a neighbor that a cement truck drove into Parker's property and another was seen in a bay of the pole building.

110.    On October 27, 2020, Tom Becker informed Flanagan-Rockett that on October 26, 2020, there were three vehicles in employee parking and one cement truck onsite, and that Plaintiffs had begun hearing muffled truck maintenance and washing sounds performed inside the pole building.

111.    On October 29, 2020, in a drive-by at Parker's property, Flanagan-Rockett photographed what appeared to be Parker's LB-33 conveyor pump truck parked outside in his gravel yard.

112.    On October 30, 2020, Tom Becker texted Flanagan-Rockett that on both October

28 and 29, 2020, there were three driver vehicles in Parker's employee parking lot, and on October 30, 2020, there were two driver vehicles in employee parking, with cement pump trucks coming in and out of the property over the past three days.

113.     On November 2, 2020, Flanagan-Rockett texted Plaintiff Tom Becker that she was sending the Parker case to adjudication court.

114.     On November 2, 2020, Flanagan-Rockett's log stated: "This owner is still running his business from his home.  The cement commercial trucks are being parked in the pole barn and employees are still parking on the property.  I am sending this case to the Adjudication Court.  The owner was told during his Pre-App that this commercial business is not permitted."

115.     On November 30, 2020, Plaintiff Tom Becker sent Flanagan-Rockett a text and stated that during the past month Parker and his employees had continued to dispatch and maintain his cement trucks at this location, along with concern over "Mr. Parker's intent & long term consequences of initiating industrial use in our rural neighborhood."

**Parker Concrete Hires Attorney Seeking Zoning Change of Agricultural Property**

116.     On December 18, 2020, Flanagan-Rockett's log indicated that she was contacted by Attorney Nate Washburn, of Kavanagh, Grumley & Grobold, LLC, a Joliet attorney firm that regularly practices zoning matters in front of the Will County Board and that was now representing Brian Parker.

117.     On December 18, 2020, since Attorney Washburn advised Flanagan-Rockett that they were awaiting approval of a new text amendment by the County Board to allow certain commercial businesses to operate on A-1 properties, Flanagan-Rockett postponed Parker's adjudication hearing.

18

**Plaintiff Tom Becker's December 23, 2020 Visit with Brian Parker**

118.     On December 23, 2020, Defendant Parker invited Plaintiff Tom Becker to his home for a visit and informed Becker that he had hired an attorney firm in Joliet with a lot of "juice" at the Will County Board, and his new attorney would get his business an industrial yard onsite due to a new ordinance.

119.     On December 23, 2020, Defendant Parker told Plaintiff Tom Becker that once his new industrial yard was approved, he would run his business exactly like he had been doing, and the whiny neighbors could call and complain to the Sheriff's office and there was nothing they could do about it.

120.     On December 23, 2020, when Plaintiff Tom Becker inquired as to whether Defendant Parker was capable of doing mechanic work on his cement trucks, Parker laughed and told Becker that the truck manufacturers provide service warranties for these expensive vehicles and send out skilled technicians for truck repairs to keep them running continuously.

121.     During this visit, Plaintiff Tom Becker asked Defendant Parker why he had not just purchased or rented a building in the nearby Monee Industrial Corridor or the township's LaGrange Road commercial district, set aside for businesses like his.

122.     On December 23, 2020, Defendant Parker told Plaintiff Tom Becker that he had contemplated buying a $700,000 warehouse in the University Park/Monee Industrial corridor, but that he was saving $10,000 a month in warehouse rental fees by operating his business at his farm.

123.     Defendant Parker also explained to Plaintiff Tom Becker that the cost of land with commercial or industrial zoning at the township's LaGrange Road commercial corridor was

much more expensive than buying the cheap farmland here.

124.     During that visit, Defendant Parker expressed to Plaintiff Tom Becker his intention of dispatching his fleet from this rural location, which would include both indoor truck storage in the pole building and outdoor truck storage in the yard.

125.     At that time, Defendant Parker boasted that he was going to purchase two more cement pump trucks, each valued at approx. $750,000, and that the exhaust of these cement trucks was so hot that they could only be stored outdoors.

126.     During that December 23, 2020 visit, Defendant Parker also told Plaintiff Tom Becker that he was considering adding another truck shed located between his house and Monee-Manhattan Road in order to expand his operations at this location.

127.     Defendant Parker told Plaintiff Tom Becker of the many financial opportunities available in having a storage yard for his business in Will County, given the extraordinary potential for cement truck work due to the ongoing construction at Joliet/Elwood's Centerpoint Intermodel Center, the largest inland port in America.

128.     On December 29, 2020, Plaintiff Tom Becker sent a text to Flanagan-Rockett to inquire as to the current status of Parker's case, as cement truck activity was still continuing.

129.     On December 31, 2020, Plaintiff Tom Becker sent Flanagan-Rockett a text to inform her that Parker had told him he may be filing a SUP ("Special Use Permit").

130.     On January 4, 2021, Flanagan-Rockett texted Plaintiff Tom Becker and stated that Parker was going to proceed with the new Will County amendment SUP.

131.     On January 4, 2021, Plaintiff Tom Becker wrote Flanagan-Rockett that Parker told him he was originally planning on moving his business out of the rural neighborhood and

into an industrial yard, but now, because of the newly passed Will County SUP amendment, he was not going to.

132.     On February 4, 2021, Defendant Parker's attorney, Nate Washburn, filed a zoning application for a Special Use Permit for Construction Sales & Services in A-1 zoning, under a new hybridized text amendment recently passed by the Will County Board.

133.     In Defendant Parker's February 4, 2021, zoning application, Parker's attorney was asked the following questions and listed the following answers: "Is the purpose of this application to address an ordinance or code violation? [Box checked yes].  If yes, what is the violation? [Answer] Alleged operation of a concrete business in an A-1 zoning district."

134.     In March, 2021, Plaintiffs spoke with neighbors, who worked in the construction business, about the Parker Concrete SUP zoning application.

135.     Those neighbors informed Plaintiffs that there were strict regulations on cement truck washings, due to toxic wastewater issues.

136.     On March 31, 2021, Flanagan-Rockett's log entry notes Attorney Washburn advised her that the Green Garden Planning Commission on the Parker matter had been set for May 5, 2021, and a meeting with the Green Garden Board had been set for May 12, 2021.

137.     On or about April 9, 2021, Attorney Washburn sent Plaintiffs, as adjoining landowners, a letter giving notice of Parker's attempt to re-zone his agricultural property with a Special Use Permit for Construction Sales and Services in an A-1 (agricultural) Zoning District.

138.     In Attorney Washburn's letter, he stated: "The requested action is as follows: Storage of equipment **and operation of Parker Concrete from the property** (emphasis added)."

21

139.     On April 12, 2021, Plaintiff Tom Becker texted Flanagan-Rockett that Parker Concrete continues to operate illegally on this site.  Becker wrote that a neighbor who lives in the Canterbury Estates subdivision observed a Parker cement truck with its lights off while driving down Parker's driveway, only putting its headlights on once the truck reached Monee-Manhattan Road.

**1st IEPA Complaint Filed Against Parker Concrete for Cement Truck Washings**

140.     On April 20, 2021, the first IEPA citizen complaint was filed against Parker Concrete for cement wastewater dumping at 7608 W. Monee-Manhattan Road, Monee, IL.

141.     On April 21, 2021, IEPA's Al Gonzalez contacted Defendant Parker, who denied the allegations and attributed the complaint to "bad neighbors".

142.     On April 22, 2021, IEPA's Al Gonzalez wrote Parker an email and requested Parker respond in writing to numerous questions Gonzalez summarized from the IEPA citizen complaint.

143.     In the Spring of 2021, as a result of Defendant Parker's SUP application, both the nearby high-end subdivisions of Tuscan Hills and Canterbury Lakes, adjacent to Parker's farm acreage, engaged in petition drives against Parker Concrete operating in their rural residential neighborhood.

144.     The petition drives yielded signatures from 161 local residents mainly surrounding Parker's property, who opposed Defendant Parker's zoning change.

145.     On April 27, 2021, Attorney Washburn wrote an email to Flanagan-Rockett: "I wanted to speak to you today about what we need to do to resolve the code enforcement action against Mr. Parker.  It is my understanding that Mr. Parker has rented a larger facility in Glen

Ellyn and has not had any business equipment at the property in several months."

146.     On April 27, 2021, in that same email, Washburn stated: "At this time, as I explained to Brian [Radner at Will County Land Use Department] yesterday, it is our intention to close out the enforcement action and withdraw our application for a special use permit as the property is not being used for any business purpose and my client no longer desires to use the property for any business purpose."

147.     On April 27, 2021, in Flanagan-Rockett's email response, she remarked: "As far as the open violation I will need to go out to Mr. Parker's property to take photos that his business vehicles are not on site.  Once I take those photos and observe the personal vehicles and no business vehicles I can close his case for him.  **There would be no fines, as long as he doesn't bring them back** (emphasis added)."

148.     On April 28, 2021, Flanagan-Rockett's log stated she went to Parker's property and did not observe any workers parked on site or commercial cement trucks.

149.     On April 28, 2021, Flanagan-Rockett's log further noted that she observed two cement trucks in Parker's pole building, but that: "The cement trucks in the building are inoperable and he only works on them in the pole building.  Once they are operable, licensed and insured they will be removed from site to the Glen Ellyn site."

150.     The April 28, 2021 photos taken by Flanagan-Rockett of Defendant Parker's alleged "inoperable" trucks identified a white/orange cement truck, and a white/blue cement truck, which appears to be Parker's 45-meter pump truck that returned onsite the following year.

151.     On April 29, 2021, Tom Becker sent a text to Flanagan-Rockett about the dangers of cement wastewater dumping in light of the shallow aquifer that provides well water for local

residents.

152.     On April 29, 2021, Flanagan-Rockett's log noted: "After further discussion this case will be closed.  Compliance has been met since the owner has moved his business."

153.     On April 30, 2021, Parker responded in writing to questions by IEPA investigator, Al Gonzalez, stating that he did not wash pump trucks at 7608 Monee-Manhattan Road.

154.     On May 3, 2021, Brian Parker's zoning application was withdrawn.

155.     On May 5, 2021, Flanagan-Rockett's correspondence further noted: "Mr. Parker and Nate Washburn are both working on the open complaint with the I.E.P.A. as well, which does not involve our department here in Code.  **Both are aware that NO commercial vehicles can come back to this residence** (emphasis added)."

**IEPA's Field Visit at Parker's Property**

156.     On May 18, 2021, IEPA's Al Gonzalez contacted Defendant Parker to announce a field visit the next day, May 19, 2021.

157.     On May 19, 2021, IEPA's Al Gonzalez met Parker at his property and stated the following: "No wash water operations ongoing, and items stored outside did not appear to cause a surface runoff to the adjacent farm fields."

158.     On May 24, 2021, IEPA's Al Gonzalez found: "No further investigation is warranted at this time" and closed the complaint against Parker Concrete.

**Parker Concrete Resumes Industrial Cement Business on Agricultural Property**

159.     On May 27, 2021, a mere three days after the IEPA closed its IEPA investigation concerning Parker Concrete, Parker Concrete resumed its industrial operation at 7608 W. Monee-Manhattan Road, with a Parker Concrete Loopbelt 40-meter conveyor truck onsite.

160.     Parker Concrete's Loopbelt 40-meter conveyor truck was not one of the two "inoperable trucks" as photographed on April 28, 2021 by Flanagan-Rockett prior to closing the County case against Parker Concrete.

161.     For the next eighteen months, Defendant Parker continued to operate his illegal business on the agricultural property.

**Plaintiffs Document Parker Concrete's Illegal Truck Activity**

162.     On May 27, June 3, June 5, June 8, June 10, June 11, June 16, and June 21, 2021, Parker Concrete cement pump and/or conveyor trucks were observed being washed, maintenanced, and/or stored outside at Parker's 7608 W. Monee-Manhattan Road property.

163.     Specifically, on May 27, June 3, June 5, June 8, June 16, and June 21, 2021, Plaintiffs photographed Parker Concrete's Loopbelt 40-meter conveyor truck being washed and/or maintenanced at Parker's rural property. *See* Exhibit B.

164.     On June 3, 2021, Plaintiff Jeff Becker heard the sound of truck washing and photographed Parker Concrete's Loopbelt 40-meter conveyor truck, with the conveyors (which deliver cement) extended during the cement truck washout at Parker's gravel yard onsite. *See* Exhibit B, top photo.

165.     On June 8, 2021 and June 16, 2021, Plaintiff Jeff Becker captured videos and photographs of Parker Concrete's Loopbelt 40-meter conveyor truck being washed, with huge plumes of water flying into the air, at Parker's agriculturally zoned property. *See* Exhibit B, bottom photo.

166.     On June 21, 2021, Plaintiff Tom Becker texted Flanagan-Rockett to inform her that Parker Concrete had resumed its illegal activity in their neighborhood.

167.     On June 22, 2021, Plaintiff Jeff Becker photographed a red and gray cement truck parked outdoors at Parker's property.

168.     On June 23, 2021, Plaintiff Tom Becker sent photographs to Flanagan-Rockett of eight recent dates of Parker Concrete truck maintenance, washings and outside storage.

169.     On June 23, 2021, Flanagan-Rockett wrote Will County Land Use Department's Marguerite Kenny: "Please read the email [complainant information blacked out in FOIA request] regards to the discussion we had yesterday about Mr. Brian Parker's cement business at 7608 W. Monee Manhattan Rd. (My last case number is 21LU00173. This looks like more than just "stopping for lunch" I do want to advise that the owner had two disabled cement trucks stored in the pole building that he has been working on, he was advised that it was okay to work on. Please let me know your thoughts on this."

170.     On June 23, 2021, Marguerite Kenny responded to Flanagan-Rockett's email as follows: "I would definitely agree. **It appears to be above and beyond 'stopping at your house for lunch,' he is washing/rinsing off the trucks/equipment on the property. I would say that this falls under construction services and is not permitted in A-1** (emphasis added)."

171.     On June 23, 2021, Flanagan-Rockett wrote Plaintiff Tom Becker a text and told him she was going to talk to the States Attorney's Office and will be sending Plaintiffs' information to the SAO.

**3rd Will County Code Enforcement Violation Notice Sent to Parker Concrete**

172.     On June 30, 2021, Flanagan-Rockett sent Brian Parker a third violation notice, 21LU00480 CE, where he was again cited for violating Ordinance 155-7.20-D. "It is a prohibited use to run a commercial business from your property based on your Zoning District of A-1. It

was determined by our department and was stated during our Pre-Application meeting that you

are in fact running a commercial business from your residence.  You are required to come into

compliance with our department and cease all commercial related activity on the property."

**Code Enforcement Re-Opens Land Use Case Against Parker Concrete**

173.     On June 30, 2021, Flanagan-Rockett's log stated: "I am re-opening this case.

There was a new complaint that came in showing evidence that the trucks are still being

dispatched out of this residence.  There's also photos showing the owner washing the trucks,

which is still considered to be construction services and not permitted in A-1.  Please refer to last

case 20LU00173 showing the owner is aware that that [sic] this activity is considered

commercial and not permitted on A-1.  I am sending a V-1 to the owner and then sending this

case over to SAO."

174.     However, on July 28, 2021, Flanagan-Rockett made the following entry in her

log: "I have conducted multiple inspections on this property throughout the month at different

times.  I have not seen any truck traffic in or out of this residence.  I will talk to the SAO."

175.     On August 30, 2021, while Plaintiff Jeff Becker was on his driveway, he observed

Brian Parker driving the Loopbelt 40-meter conveyor cement truck into his property from

Monee-Manhattan Road.

176.     On August 30, 2021, approximately 15 minutes later, Plaintiff Jeff Becker took

two short videos of Parker washing the Loopbelt 40-meter conveyor cement truck, with huge

plumes of water spraying across his gravel yard.

177.     On September 2, September 7, September 8, September 9, and September 10,

2021, Plaintiffs took photographs showing at least two Parker Concrete pump trucks at this

property, including a smaller Parker Concrete Schwing mobile white pump truck, attached to a flatbed vehicle.

178.     On October 4, 2021, Flanagan-Rockett's log stated: "I have left this complaint open for several months.  I have not seen any truck traffic coming and going.  This case is being closed."

179.     Prior to closing the case, Flanagan-Rockett did not contact Plaintiff Tom Becker to inquire whether Parker Concrete truck activity was still ongoing at the agricultural property.

**Code Enforcement Closes 3rd Violation Complaint Despite Photographs Sent by Plaintiffs**

180.     Immediately after the closing of the 3rd violation case against Parker Concrete, Parker Concrete truck activity continued.

181.     On October 5-6, 2021, Plaintiffs took photographs of Parker Concrete trucks onsite including the Schwing mobile white pump truck and the Loopbelt 40-meter conveyor, as well as videos on October 6, 2021 of Parker Concrete truck washing.

182.     On October 12, 2021, Plaintiff Tom Becker sent an email, with attachments, to Flanagan-Rockett showing photographs of eight more instances of Parker Concrete truck activity.

183.     On October 12, 2021, Flanagan-Rockett sent Plaintiff Tom Becker an email: "Are you willing to testify in court to these photos you have taken?"

184.     On October 12, 2021, Plaintiff Tom Becker responded to Flanagan-Rockett's email as follows: "Hi Megan: [name blank in FOIA request] took the images and videos in May-June and also in August-October of Parker Concrete Pumping's continued commercial operations and cement washout water dumping into the ground above our neighborhood drinking

water aquifer. **We would certainly testify in court as to taking these images and videos** (emphasis added)."

185.     On October 22, 2021, Flanagan-Rockett's log noted: "I spoke with the owner, who has advised that he has not been bringing trucks back.  The only truck he brings in is his work vehicle that he drives.  I spoke to the Zoning Administrator about this, he is allowed as of right a commercial vehicle on the property and he parks this work commercial vehicle in his pole barn so it is out of site.  I will be conducting an inspection when in November to meet with the owner on site, he will show me that he only has his work truck and the two trucks inside the pole barn that we agreed he could keep to work on in the past violation case."  However, no November site inspection is listed by Flanagan-Rockett in her log.

186.     On November 16-18, 2021, Plaintiffs took photographs of Parker Concrete's blue LB-33 Conveyor truck at Parker's property.

187.     The November 17, 2021, photograph shows a second Parker Concrete pump truck parked in the northernmost bay of Parker's pole building, with Parker's blue LB-33 Conveyor cement truck parked diagonally at the southwest corner of his pole building.

188.     On November 19, 2021, Plaintiff Jeff Becker photographed and took a short video of Parker Concrete washing onsite an unknown, blue Schwing cement truck (with no Parker Concrete discernable signage, nor listed on Parker Concrete's website).  *See* Exhibit C, top photo.

189.     On November 20, 2021, Plaintiff Tom Becker photographed at dusk one pump truck in the northernmost bay of Parker's pole building and a second pump truck, most likely his blue LB-33 Conveyor, parked diagonally next to his pole barn.

29

190.     On November 23, 2021, Plaintiffs photographed three different Parker Concrete cement trucks on Parker's property, including a white/blue pump truck, most likely Parker Concrete's 45-meter pump truck as shown on his 2023 website.

191.     On November 23, 2021, Plaintiff Jeff Becker photographed Parker Concrete's Loopbelt 40-meter conveyor cement truck being washed, including a photo showing Parker or one of his employees on a ladder, with plumes of water being sprayed across his gravel yard.

192.     On November 24, 2021, one day later, a neighbor at the entrance of the Canterbury Lakes Subdivision on Devonshire Lane took a photograph of Parker Concrete's blue LB-33 Conveyor cement truck entering Parker's farm property.

193.     On November 24, 2021, that same evening, Plaintiff Tom Becker took an 8-minute video of the washing of Parker's blue LB-33 conveyor cement truck in the dark, without truck lights on to conceal its location.

194.     Within a two-day period, November 23-24, 2021, three different active, working Parker Concrete cement trucks, the Loopbelt 40-meter conveyor, the blue LB-33 Conveyor, and the white/blue 45-meter pump truck, were all photographed either being washed, dispatched, and/or stored at Parker's 7608 W. Monee-Manhattan Road location.

195.     On December 8, 2021, Plaintiff Tom Becker informed Flanagan-Rockett of Parker's continued illegal washing and maintenance activities at Parker's agricultural property.

196.     On December 9, 2021, Plaintiff Tom Becker sent an email to Flanagan-Rockett with attachments of photographs of Parker Concrete's recent cement truck activity including washings and maintenance between November 16-December 1, 2021, as well as supplying Flanagan-Rockett with the earlier May 27-October 10, 2021 photographs of cement truck

washings, maintenance, and dispatch relating to Parker Concrete's 3rd violation notice.

197. On December 9, 2021, Plaintiff Tom Becker's email to Flanagan-Rockett stated: "Our neighbors and I can testify to the veracity of these photos. Parker's new claim that he is simply using these huge trucks as "commute" vehicles is pure fraud. It is a 102-mile round-trip from Monee to Glen Ellyn, where Parker Concrete has a zoned dispatch yard. The cost of transporting these vehicles is so expensive that the client hiring Parker Concrete is responsible for mileage costs to and from a work site."

198. On December 22, 2021, Plaintiff Tom Becker called and spoke with Flanagan-Rockett and was told the Parker matter would be moving to the States Attorney's Office.

**Code Enforcement Officer Does Not Re-Open Case Against Parker Concrete**

199. On January 6, 2022, Flanagan-Rockett's log stated: "Cases right now are not being sent to SAO. I also have not seen commercial vehicles during numerous drive-bys over the past few months. I am closing this case for now."

200. On January 21, 2022, Tom Becker called Flanagan-Rockett to ask for her recommendation for a local laboratory for he and his neighbors to submit well water samples to determine contamination from Parker Concrete's reckless commercial activities.

201. On January 21, 2022, Flanagan-Rockett told Becker that Parker's case would be moving forward to Will County ASA Dan McGrath for his review, despite Flanagan-Rockett knowing cases were not being sent to the SAO and that Parker's case was closed.

202. On January 28, 2022, Plaintiff Tom Becker wrote an email to Flanagan-Rockett regarding the photographs submitted by he and his neighbors stating that dates of Parker Concrete truck activity were not comprehensive, as they only identify times when the

neighborhood happened to document the commercial activity onsite.

**Parker Concrete Truck Activity Resumes on Agricultural Property**

203.    On March 17, 2022, Plaintiff Jeff Becker photographed Parker Concrete's Loopbelt 40-meter conveyor cement truck located outdoors at the southwest corner of Parker's pole building.

204.    On April 5, 2022, Plaintiff Jeff Becker photographed Parker Concrete's 45-meter cement pump truck parked inside the second bay of Parker's pole building.

205.    On April 12, 2022, Plaintiff Jeff Becker photographed Parker Concrete's LB-33 conveyor cement truck on the west side of Parker's pole building.

206.    On May 12, 2022, Plaintiff Jeff Becker photographed two different Parker Concrete cement trucks being washed on the same date.  *See* Exhibit C.

207.    The washout of Parker Concrete's Loopbelt 40-meter conveyor was seen in the early afternoon performed by a man wearing an orange shirt.

208.    The photographs show that the conveyors of Parker Concrete's Loopbelt 40-meter truck (that deliver concrete), were extended and were being washed out at his 7608 W. Monee-Manhattan location.  *See* Exhibit C, center photo.

209.    On May 12, 2022, a second cement truck, Parker Concrete's blue LB-33 conveyor, was washed in the evening hours before sunset by a Parker Concrete employee wearing a yellow jacket/red cap.  *See* Exhibit C, bottom photo.

210.    On May 14, 2022, Plaintiff Jeff Becker photographed Parker Concrete's Loopbelt 40-meter conveyor cement truck being maintenanced by an employee in a green shirt/white cap, with its conveyor tipped upwards.

211.     On May 14, 2022, Plaintiff Jeff Becker also photographed Defendant Parker wearing a black cap near the same Parker Concrete Loopbelt 40-meter conveyor cement truck, evidencing both Defendant Parker and a Parker employee were working at his property at the same time and date.

**Parker Concrete's Illegal Truck Activity in Summer of 2022**

212.     On July 19, 2022, Plaintiff Jeff Becker photographed Defendant Parker washing his 39-meter cement pump truck in Parker's yard at the southwest corner of his pole building.

213.     On July 20, 2022, Plaintiff Jeff Becker photographed Parker Concrete's white Schwing mobile pump truck, attached to a flatbed truck, being washed at the west side of Parker's gravel yard.

214.     On August 4, 2022, Plaintiff Jeff Becker photographed Defendant Parker washing the 39-meter cement pump truck, with huge plumes of water spraying across the gravel yard next to his pole building.  *See* Exhibit D, top photo.

215.     On August 11, 2022, Plaintiff Tom Becker sent an email to Flanagan-Rockett, "with examples of Parker Concrete's continued cement truck washings, with different trucks and employees between March - August 2022, including the July 19 and last week's August 4 photos of owner Brian Parker washing cement pump trucks.  These washout sessions can last for over 45 minutes, saturating the ground with toxic cement washout.  Parker Concrete's conduct is well beyond a legal nuisance, as it is intentional and reckless.  Parker is fully aware of the industry standards."

216.     Plaintiff Tom Becker's August 11, 2022 email documented sixteen different dates of truck activity between May-December 2021, and five additional dates of illegal operation in

2022, including conveyor washouts and truck washings by Parker himself.

217.     On August 11, 2022, Flanagan-Rockett sent an email to Will County Division Director Tim Mack and stated: "I have all the case notes and photos from prior violation cases on this address below. I believe that this should go straight to SAO for OV court. I can call Dan McGrath tomorrow afternoon after my inspections to explain the case and discuss what photos he needs me to go out and get and discuss having Tom Becker testify to these most recent photos."

218.     On August 15, 2022, Plaintiff Jeff Becker photographed Defendant Parker washing the 39-meter cement pump truck at his gravel yard. *See* <u>Exhibit D</u>, center photo.

219.     On August 18, 2022, Flanagan-Rockett called and spoke with IEPA's investigator, Al Gonzalez.

220.     On August 19, 2022, Plaintiff Jeff Becker photographed two different Parker Concrete cement trucks stored outdoors at the same time in Parker's yard, the Loopbelt 40-meter conveyor and a yellow/gray Telebelt Putzmeister cement pump truck (mainly covered by trees).

221.     According to Flanagan-Rockett's log: "I conducted a field inspection Friday 08-19 around 2 in the afternoon. Upon arrival I observed a large commercial vehicle onsite (conveyor for cement). See photo attached. There was no sign of run off on the gravel lot. And it appeared no one was home or on site."

222.     The August 19, 2022 Flanagan-Rockett photograph shows a gray/black/yellow cement truck. The cab door of this cement truck contains company signage unrelated to Parker Concrete, and it was not one of the cement trucks identified in the fleet of Parker Concrete cement trucks on its 2023 website.

223.      This was not the first time that cement pump trucks, other than those owned by Parker Concrete, were observed at this rural site.

224.      On the evening of August 19, 2022, Plaintiff Jeff Becker again photographed this same cement truck being stored outdoors at Parker's gravel yard.

225.      On August 19, 2022, Flanagan-Rockett emailed IEPA's Al Gonzalez: "Hi Al, Here is the most recent complaint photos that came in for property address 7608 Monee Manhattan Rd, Monee. The complainants main concern is the washing of cement trucks and the toxic cement washout water that is dumping into their drinking water supply. He stated that its dumping carcinogen into the drinking water. Last time we spoke was on 05-14-2021 and you had advised that you were heading out there to this address that next week...I don't know if that will help you find the case? Please let me know if you would have to do another inspection. I plan on opening a case on my end again for the commercial vehicles since he is prohibited to have those on an agricultural piece of property."

**Plaintiffs Contact Will County Health Department**

226.      On August 19, 2022, Plaintiff Tom Becker sent Kim Koran, at the Will County Health Department, Eastern Division, correspondence regarding his drinking well water concerns due to Parker Concrete cement trucks being repeatedly washed and maintenanced at 7608 W. Monee-Manhattan Road, with the potential for toxic cement wastewater/chromium-6 polluting the shallow, sand and gravel aquifer at this location.

227.      On August 22, 2022, Plaintiff Tom Becker followed-up with a call and spoke with Mrs. Koran concerning whether the Will County Public Health Department could get involved to assist Plaintiffs' rural neighborhood in determining whether their drinking well water had been

contaminated by Parker's commercial activities.

228.     On August 22, 2022, Koran told Tom Becker that the agency responsible for this type of water violation was not the Will County Health Department, but the IEPA.

229.     On August 22, 2022, Plaintiff Jeff Becker photographed Defendant Parker standing on his Loopbelt 40-meter conveyor cement truck while operating its boom outdoors in the gravel yard by the pole building, with said maintenance lasting for an hour.

230.     The August 22, 2022, photograph by Plaintiff Jeff Becker also showed a second Parker Concrete cement truck parked in the second bay of Parker's pole building.

231.     On August 22, 2022, Flanagan-Rockett's log stated: "I called the inspector for I.E.P.A. (Al Gonzalez [portion blanked out, likely a phone number]) who went out for his inspection in May of 2021 for case report C#21-63.  He forwarded me his inspection report and advised that when he was on site there was no evidence of run off from the washing of cement trucks **and the owner stated to him that they did not wash trucks there** (emphasis added)."

232.     On August 22, 2022, Flanagan-Rockett's log stated: "The owner is operating a construction business at this residence for his company Parker Concrete.  This owner was previously in violation in 2020 and 2021.  Construction services is not permitted in the A-1 zoning district, not as of right and not with [sic] a special use permit.  The owner must move the business and all business-related equipment and vehicles off of the site or he can try to re-zone the property to either C-4, I-1, I-2 or I-3 zoning districts where construction service are a permitted use."

233.     On August 23, 2022, Plaintiff Tom Becker photographed Defendant Parker again maintenancing the Loopbelt 40-meter conveyor cement truck at the gravel yard onsite, with

another cement pump truck inside the pole building.

**4th Will County Code Enforcement Violation Notice Sent to Parker Concrete**

234.     On August 25, 2022, Flanagan- Rockett cited Parker for his fourth Will County Code violation, Case # 22LU00723, where she cited Parker for a violation of Ordinance 155-8.40-I, "Per the Will County Zoning Ordinance, Construction Services is not a permitted use in the A-1 district.  You are required to move the construction business off the property, or re-zone the property to a zoning district where Construction Services is allowed as of right."

235.     On August 26, 2022, Plaintiff Jeff Becker photographed Defendant Parker washing Parker Concrete's 39-meter cement pump truck on the west side of his pole building.

236.     On August 26, 2022, Plaintiff Tom Becker sent an email to Flanagan-Rockett with photographs from August 15, 19, 22, 23, and 26 of Parker Concrete truck activity, stating: "Parker Concrete is committing a crime against our rural community, and its actions are intentional and reckless.  Illinois Statute 415 ILCS 5/44(b) defines 'Calculated Criminal Disposal of Hazardous Waste' as when a person, without lawful justification, knowingly disposes of hazardous waste that 'creates an immediate or long-term danger to the public health or the environment.'"

**2nd IEPA Citizen Complaint Filed Against Parker Concrete**

237.     In August 2022, a 2nd IEPA citizen complaint was filed regarding Parker Concrete's continued cement truck washings and dumping of cement wastewater into the ground.

238.     On August 30, 2022, IEPA investigator Al Gonzalez indicated in an email that he delegated site inspection responsibilities regarding Parker Concrete to Will County Code

Enforcement Officer Flanagan-Rockett.

239.　　On September 6, 2022, Flanagan-Rockett emailed Will County Zoning Administrator Marguerite Kenny the following: "Thank you for taking my call today regarding Parker concrete at 7608 Monee-Manhattan.  Brian Parker's fiancé, Dawn, has been in contact with me after receiving the violation letter.  Dawn is hoping you could call her this week to go over the SUP process and what all that would entail (cost, etc.)  Brian may be interested in applying just because sometimes he has to bring a truck home.  **He also wants to possibly have the truck washing included in the SUP if that is possible (unsure if the I.E.P.A. would allow that or not)** (emphasis added)."

240.　　On September 7, 2022, Plaintiff Tom Becker documented two cement pump trucks stored in Parker's pole building.

241.　　On September 7, 2022, Plaintiff Tom Becker also documented Defendant Parker spreading an unknown substance across the washout site of his gravel yard with his skid steer, after which Parker walked the west perimeter of the gravel yard next to the pole building, as if measuring off dimensions.

242.　　At a September 8, 2022, meeting with Will County Land Use officials, Green Garden Township officials voiced their concerns over Parker Concrete's continued, un-permitted commercial activity and its potential for environmental harm.

243.　　On September 9, 2022, Flanagan-Rockett's log stated: "Received a call from the owner's fiancé, Dawn, last week who advised they received the violation letter.  **The owner was unaware that they could not wash the trucks on site**.  **I advised her that we would consider that commercial use.**  I also advised her that when I was on site there was commercial truck on

site (emphasis added)."

244.    On September 12, 2022, Tim Mack at Will County Land Use emailed Flanagan-Rockett and stated: "**This cases [sic] was also a topic of discussion when I met with Green Garden Township on Thursday. They apparently have evidence of the truck washing and potential runoff. Their concern is related to that this isn't a permitted activity and potential environmental damage** (emphasis added)."

245.    On October 4, 2022, Flanagan-Rockett's log indicated a meeting with Parker and the Will County Land Use Department noting that cement truck maintenance operations were not permitted on Parker's agricultural property, as that is commercial activity.

246.    On October 10, 2022, less than a week after the Will County Land Use meeting with Parker, Plaintiff Jeff Becker photographed Brian Parker, wearing a gray shirt, performing outdoor maintenance on the 45-meter cement boom pump truck at his gravel yard.

247.    On October 10, 2022, a second Parker Concrete cement truck was observed in the pole building.

248.    On October 12, 2022, Plaintiff Tom Becker photographed Defendant Parker, wearing a red sweatshirt, near the 45-meter cement pump truck with its boom stretched up into the air, with a Parker Concrete employee, wearing a gray plaid coat, on the deck of the cement truck near the cab, while performing outdoor maintenance work at the gravel yard. *See* <u>Exhibit D</u>, bottom photo.

249.    On November 16, 2022, IEPA investigator, Al Gonzalez, wrote IEPA's Todd Bennet and Jay Patel: "I contacted Megan's office (WCLUD) a few minutes ago and her voice mail indicated she will be on vacation from Nov 11 thru Nov 29. I can log the second complaint,

but was waiting for Megan to do her investigation first-probable in September- and to hear if she had encountered surface runoff issues to merit an IEPA/FOS response.  Please advise."

250.　　On December 8, 2022, Plaintiffs Tom and Jeff Becker wrote a joint letter emailed to Will County and IEPA officials, with 40 photographs from June 2021 through October 2022 of Parker Concrete's truck washings, maintenance, and outdoor storage, regarding both agencies' failures to cite or properly investigate Parker and his illegal truck activity and dumping of toxic wastewater on his agriculturally-zoned property.

**Parker Files for 2nd Zoning Application Change for Rural Property**

251.　　On January 3, 2023, Defendant Parker filed his 2nd Special Use Permit application with the Will County Land Use Department, ZC-23-001 (S-23-001), for an alleged storage yard, requesting the ability for "repairs" on his cement trucks at this location, an activity not allowed under a SUP for a storage yard.

252.　　At the January 9, 2023, Administrative Hearing for Parker's 4th Will County Land Use violation, the Will County Hearing Officer granted a continuance in Case 22LU00723 until April 3, 2023, to allow for consideration of Parker's recent special use permit application.

253.　　Defendant Parker failed to attend his own Administrative Hearing and was ordered to be present at the administrative adjudication on April 3, 2023.

254.　　On January 17, 2023, Plaintiff Steve Becker wrote Will County's Zoning Administrator Marguerite Kenny the following regarding Defendant Parker's January 3, 2023 2nd SUP application: "Not only is Mr. Parker's application inaccurate, it is perjurious.  The very first question asked in the application is: 'Is the purpose of this application to address an ordinance or code violation?'  Mr. Parker, under notary, answered, 'No.'  Yet, the County is well

aware that Mr. Parker is presently under a violation notice since it is currently prosecuting the case against him."

255.    Despite the IEPA citizen complaint being filed in August 2022, the first site visit by IEPA investigator Al Gonzalez did not occur until almost six months later on February 6, 2023, with snow-cover on the ground and no truck activity during the winter months.

**Plaintiffs Send NOI Letter to Sue Under Clean Water Act**

256.    On February 21, 2023, Plaintiffs Steve, Tom, and Jeff Becker submitted a notice of intent to sue letter (hereinafter "NOI") regarding a citizen complaint against County and State agencies and Defendant Parker and his cement truck companies due to their failure to comply with the Clean Water Act, 33 U.S.C. § 1365(a)(1).

257.    The NOI letter noted that since 2019 Defendant Parker and his cement truck businesses illegally operated an industrial yard for cement conveyor and pump trucks on farmland without any industrial zoning, a Stormwater Pollution Prevention Plan (SWPPP), a National Pollutant Discharge Elimination System Permit (NPDES), necessary washout facilities, environmental buffers, or sewers for industrial waste disposal.

258.    The NOI letter stated that Parker Concrete had performed hundreds of cement truck washings "dumping a toxic slurry of heavy metals, including the deadly water-soluble carcinogen Chromium 6 (Hexavalent Chromium), into the ground over the shallow sand and gravel aquifer that provides the drinking water supply for local wells and discharges into Forked Creek, a protected 'waters of the U.S.'"

259.    The NOI letter detailed that despite making multiple complaints to Will County Land Use and the IEPA, these agencies failed to either fine Parker Concrete for its zoning

violations, or take any corrective action to prevent the dumping of cement waste water into the local water supply.

260.    The NOI letter further described that as Parker Concrete trucks returned from work sites, cement truck washings were performed to prevent cement from hardening on the vehicles, conveyors, and booms.

261.    The NOI letter highlighted that concrete wastewater "is a slurry of caustic, corrosive, and toxic metals caused by the chemical reaction of hydration. Compounds like Chromium and Magnesium are part of concrete mixes, and while hardened concrete is relatively benign, liquid concrete washout water has a pH near 12, similar to Liquid Drano and ammonia. Importantly, concrete wastewater contains a dangerous water-soluble carcinogen called Chromium 6 or Hexavalent Chromium."

262.    The NOI letter instructed that concrete truck washings must be conducted in a manner that does not contribute pollutants, and a washout area should not be located where there is shallow groundwater or near natural drainage ways or wetlands, nor within 400 feet of any stormwater pattern or within 1,000 feet of any wells or drinking water sources.

263.    The NOI letter noted that cement truck washings are lengthy, toxic discharges that saturate the ground and percolate through the soil into the groundwater.

264.    The NOI letter stated that prior to Parker Concrete ever bringing a single cement pump truck to this agricultural property, an NPDES Permit and SWPPP plan were required under IEPA regulations, along with the re-zoning of the farm for industrial use. The SWPPP should have identified onsite stormwater patterns, a bermed or curbed industrial yard, a daily monitored and IEPA-inspected concrete washout facility, and a local sewer system connection for indoor

drains to avoid hazardous solvents and fluids in truck maintenance being discharged directly into the soil.

265.    No IEPA permits were ever sought by Parker Concrete, nor have they ever been mandated by County or State agencies.

266.    The NOI letter stated that a legitimate IEPA site inspection should include visual review and analytical data (such as soil and groundwater sampling), a record of prior incidents of non-compliance, and an assessment of existing and potential harm for pollutants to degrade and contaminate the local environment.

267.    The NOI letter advocated that "Residents have a right to know, based on forensic evidence and risk assessment for future harm, as to the safety and quality of local drinking water and long-term adverse impacts to the area's natural resources from the persistent dumping of hazardous waste."

268.    Defendant Parker's property not only includes wetlands and stormwater patterns to the Forked Creek watershed, but it sits entirely above the fresh water aquifer that provides drinking water for local families.

269.    All five of the EPA's environmental conditions that are at risk when cement wastewater is dumped into the ground exist for Plaintiffs: (1) Parker's illegal truck washing area is within 400 feet of a local stormwater pattern that descends directly into Plaintiffs' farm; (2) Parker's illegal truck washing area is within the prohibited 1,000-feet of Plaintiffs' drinking water wells; (3) Parker's illegal truck washing area sits above a shallow aquifer that provides the drinking water supply for Plaintiffs' farm and other rural neighbors; (4) Parker's illegal truck washing area is above the shallow aquifer, where toxic wastewater can percolate into the

43

groundwater; and (5) Parker's illegal truck washing area is surrounded by hydric wetland soils that are connected directly to the wetland soils on Plaintiffs' farm, where they grow their own food for their consumption.

270.    The risk of heavy metal contamination to both Plaintiffs' water supply and food supply is solely due to the conduct of Parker Concrete, and the risk and long-term harm to Plaintiffs' health is currently unknown, as toxic pollutants can take a decade or more before being identified in well-water testing.

271.    On March 13, 2023, the Will County adjudication hearing was held in Case 22LU00723 CE regarding Parker Concrete's commercial code violations.

272.    Code Enforcement officer Flanagan-Rockett did not ask the Plaintiffs or their neighbors to testify concerning Parker Concrete's illegal activity or verify the photographic evidence of truck maintenance and washings they submitted, and the case against Parker Concrete was summarily dismissed without any fines or deterrent.

273.    Despite the County's unambiguous agreement with Parker's attorney in April 2021 that any further truck activity on the rural site would result in fines, both 22LU00723 CE and 21LU00480 CE were essentially sham investigations, as each complaint was opened with photographic evidence of Parker Concrete truck activity and washings, but neither case resulted in any fines for Parker Concrete.

**IEPA's March 14, 2023 Inspection of Parker Concrete's Rural Property**

274.    The very next day, on March 14, 2023, some eight months after the IEPA received its 2nd citizen complaint about Parker Concrete's truck washings on the rural site, and after an entire winter season of snow melts and rain storms had passed, IEPA investigators went

to "inspect" Parker's property joined by members of the Will County Land Use Department, that had just dismissed Parker's violation case the day before.

275.    IEPA documents reveal that on March 14, 2023, a field inspection was made regarding Parker's acreage and was a joint inspection with Al Gonzalez from IEPA's Bureau of Water, Thomas Rivera and Charlene Thigpen, from IEPA's Bureau of Land, and IEPA investigator Jose Loeza, as well as delegated inspector Tim Anderson from Will County Resource and Energy Division and Will County Code Enforcement officer Flanagan-Rockett.

276.    The March 14, 2023 "inspection" by representatives of the IEPA and Will County Land Use Department was a sham investigation meant to shield both agencies from their failure to act regarding five years of environmental abuse by Parker Concrete's illegal industrial operation at this rural site.

277.    This sham investigation can further be shown by the IEPA's absence of any forensic soil or groundwater tests on a site where hundreds of cement trucks were washed by Parker Concrete, and where there was no mention of the potential long-term harm to the shallow aquifer that provides local drinking water and to the Forked Creek watershed.

278.    That same day, March 14, 2024, Defendant Parker, formally withdrew his SUP zoning application for Parker Concrete to use his 7608 W. Monee-Manhattan Road, Monee, IL property as an industrial storage yard.

279.    The March 23, 2023 memorandum prepared by IEPA's Al Gonzalez admitted that "no field samples-water or soil-were collected at the time of the field visit."

280.    The March 27, 2023 report by IEPA's Loeza noted that the inspection was conducted in response to the Plaintiff's NOI letter regarding the Clean Water Act.

45

281.     The March 27, 2023 report by Loeza stated that Parker was interviewed about the background information on the site, described as 40 acres all zoned as A-1 agricultural with fields used to grow alfalfa and crops and that he lives on the farm with his family.

282.     The March 27, 2023 Loeza report noted that Parker operates Parker Concrete Placement out of 21W171 Hill Ave, Glen Ellyn, IL, although Loeza failed to make any mention of the four Will County violation notices or the more than four years of Parker Concrete's use of this rural farm location as the hub for its southside cement pump truck industrial operation.

283.     Loeza's March 27, 2023 IEPA "investigation" found "no apparent violations, no signs of a hazardous waste dump, and no signs of open dumping concrete truck washout were observed."

284.     On April 15, 2023, while driving down his gravel road, Plaintiff Steve Becker photographed a Parker Concrete truck with its conveyor down at Parker's 7608 W. Monee-Manhattan Road rural property.

285.     Parker Concrete's resumption of pump truck activity within a short time after County and State agencies dismissed citations or complaints against him, was the usual practice Plaintiffs had observed since 2020.

286.     On the same day, to punish Plaintiff Steve Becker for taking photographs of a Parker Concrete cement pump truck at the rural site, Defendant Parker reported Steve Becker to the Sheriff, and when that was unsuccessful, Parker sought a temporary restraining order against Steve Becker, which was also unsuccessful.

**Defendant Parker's Spoliation of Industrial Yard with Skid Steer**

287.     Three days later, on April 18, 2023, Defendant Parker was observed removing the

46

gravel base of his industrial yard with a New Holland skid steer, specifically the gravel yard around both the south and west sides of his pole building, where most of Parker Concrete's cement truck washings had been performed.

288.     The dugout gravel was moved into a pile, that was then removed offsite.

289.     The timing of Defendant Parker's spoliation of the illegal industrial yard on April 18, 2023 is relevant as it was within a week of the earliest date (April 24, 2023) Plaintiffs could file a lawsuit under the Clean Water Act.

**Plaintiffs Send Required NOI Letter under Resource Conservation and Recovery Act**

290.     On January 7, 2024, Plaintiffs also sent notice to Brian Parker, Parker Concrete Pumping, Inc. and Parker Concrete Placement Inc. of their intent to sue Parker and his businesses pursuant to the Resource Conservation and Recovery Act (hereinafter "RCRA"), 42 U.S.C. Section 69729(a)(1)(B), for generating and contributing to the disposal of hazardous waste that may present an imminent and substantial endangerment to health or the environment.

291.     In said notice, Plaintiffs addressed Parker Concrete's illegal maintenance yard at 7608 W. Monee-Manhattan Road, Monee, IL 60449, with operations conducted over five years with a toxic slurry of concrete wastewater being dumped directly into the ground.

292.     Said notice identified that Parker Concrete had knowledge of the harmful toxicity and endangerment of concrete wastewater to people, yet still engaged in a reckless disregard "for the adverse, long-term consequences to the health of the local community, the environment, the soils, and the purity of the local drinking water supply."

293.     The NOI letter stated that, "Beginning in 2019, Parker Concrete operated an illegal commercial yard for cement conveyor and pump truck dispatch, maintenance, washing,

repair, and storage on farmland, with its truck activity occurring over a 20-hour-a-day window, on weekdays, weekends, and holidays. The open dumping of wastewater from cement truck washings often lasted 45 minutes per truck, saturating the ground."

294. The NOI letter highlighted that: "Concrete wastewater is a slurry of caustic, corrosive, and toxic heavy metals, with a pH of near 12, similar to Liquid Drano and ammonia. Importantly, concrete wastewater contains the water-soluble carcinogen, called Chromium 6 or Hexavalent Chromium. Odorless and tasteless, Chromium 6 is considered a bio-accumulative toxin, and the genotoxicity of Chromium 6, once introduced into human cells, can manifest in cellular instability, and cancer. Without appropriate disposal, this hazardous concrete wastewater can leach into the soil, inhibit plant growth, pollute stormwater, harm aquatic life, and contaminate water supplies. Once Chromium 6 seepage reaches groundwater, it converts to a Chromate plume that is permanent, which is highly mobile throughout an aquifer."

295. Said January 7, 2024 notice also referenced the U.S. EPA standards that all concrete wastewater is to be collected and retained in leak-proof containers or basins "so that this caustic material does not reach the soil surface and then migrate to surface waters or into the ground water."

296. Said notice addressed the sensitive environmental location of Parker's illegal operation, which sits above the shallow, local drinking water aquifer and has noticeable stormwater patterns that discharge into the Becker farm and Forked Creek.

297. This NOI letter also referenced the inadequate State and County responses to five years of illegal operations by Parker Concrete on this rural site, which the Plaintiffs contend were sham investigations that did not collect any "forensic soil or groundwater testing which any

legitimate investigation would have mandated, given the potential harm to the safety of the local drinking water, risk of cancer to the local residents, and long-term adverse impacts to the environment from Parker Concrete's persistent and reckless dumping of hazardous waste."

298.     On April 9, 2024, the 90-day notice period required prior to the filing of a federal action under the RCRA against Defendant Parker and his businesses for citizen complaints expired.

299.     By April 9, 2024, no state or federal agency intervened or took any action to engage in forensic testing to determine the extent of harm caused by Parker Concrete's industrial operations at 7608 W. Monee-Manhattan Road, Monee, IL 60449.

300.     The Clean Water Act NOI letter and the RCRA NOI letter are, as acknowledged in writing by Defendant Parker, virtually identical in their factual allegations concerning the generation and disposal of solid or hazardous waste by Parker Concrete and the resulting health risks to humans and the environment.  In addition, Parker and his attorneys have in their possession copies of both the Plaintiffs' Clean Water Act NOI letter and the RCRA NOI letter. Thus, Defendants Parker and Parker Concrete have been on notice of these allegations for at least fourteen (14) months and have yet to take responsive corrective actions during this entire time period.

301.     Over a five-year period, Defendant Parker Concrete saved tens of thousands of dollars each year in warehouse rental costs and transportation/fuel expenses by operating Parker Concrete at this rural site.

302.     Defendant Parker Concrete repeatedly engaged in the dumping of toxic, corrosive concrete wastewater into the ground, for profit and convenience, intentionally or with reckless

disregard for the local environment, putting at risk the safety of the water supply and the health and well-being of local residents.

**Defendants Attempt to Steal Plaintiffs' Property to Eliminate Evidence for Plaintiffs' Upcoming Lawsuit**

**Historical Background**

303.     In 1974, the Beckers purchased farmland (Property PIN #18-13-13-300-010-0000), in Green Garden Township, Monee, IL, and built their home and farmstead.

304.     The Beckers' 20-acre parcel is landlocked and gains access to a public road, Monee-Manhattan Road, due to a 1,360-feet-long by 33-feet-wide private driveway, a condition existing since the 1870s. The gravel driveway has been in this location since at least the late 1930s.

305.     During the 1970s, the southern edge of a mostly barren, raised soil ridge, 631-feet-long by approximately 20-feet-wide, on the Becker farmland was twice staked by surveyors as the southern boundary of Plaintiffs' new property.

306.     As early as the Summer of 1974, the Beckers began planting the soil ridge with plants from their previous home.

307.     Because the barren soil ridge was near their new home and barnyard, the Plaintiffs' mother, Janet Campbell, envisioned and developed a landscape design for the soil ridge, which included a floral section to the East, a fruit orchard and Christmas trees for harvest in the center section, and a privacy barrier of evergreens, deciduous, and ornamental trees and bushes on the West section.  *See* Exhibit E.

308.     The Beckers' use, maintenance, and enjoyment of the soil ridge was done in full view of all surrounding property owners without objection, and the beautification of the soil

50

ridge has spanned two generations of the Becker family for almost a half century. *See* Exhibit E.

309.     During the early 1990s, after the Beckers received complaints from delivery drivers about overgrowth of trees/bushes along their driveway coming from their neighbor's property to the West, Plaintiff Jeff Becker spoke with that landowner, Ann Riehle.

310.     Ms. Riehle, who was divorced and could best be described as a recluse, refused to hire anyone to clean up her property boundary, and told Plaintiff Jeff Becker she could care less if he pruned the trees/bushes.

311.      Since that time, in order to keep their driveway access open, Plaintiffs began a longstanding practice of seasonally managing and proactively pruning the trees/bushes on the neighbor's property along the Plaintiffs' driveway.  The Plaintiffs' pruning regularly extended 10-15 feet into the neighbor's property, with Plaintiffs hauling back the larger branches to their farm for burning.

312.     This necessary practice of maintenancing the trees/bushes on the neighboring property along the west side of the Becker driveway continued after the passing of Ann Riehle in 2015, and in full view of its new owner, Defendant Brian Parker.

**Plaintiffs' Attorney Asserts Adverse Possession of Soil Ridge After Rental Farmer Threatens to Chain-Saw Down Tree Line**

313.     In the Summer of 1994, after encroachments by a rental farmer's equipment, the Beckers began placing hay bales and metal stakes with ribbons along the southern portion of the soil ridge to protect the tree/bush branches and roots from damage. *See* Exhibit E, bottom left photo.

314.     As of September 1994, the Beckers had planted and exclusively used and maintained the soil ridge for a period of 20 years.

315.     In 1996, the rental farmer of landowners, Ann and Therese Riehle, threatened to chain-saw down the tree line on the soil ridge to increase crop rows.

316.     In order to preserve the entire tree line, the Becker's mother, Janet Campbell, hired Attorney James Chesloe to defend her property rights.

317.     A 1996 survey by the new adjoining landowners claimed that the boundary line on the western portion of the soil ridge was more towards the center and asserted that six of the trees planted by the Beckers on the 631-foot-long soil ridge were 1-3 feet offline.

318.     This 1996 survey also memorialized 27 hay bales placed by Plaintiffs along 90-feet of their soil ridge damaged by the rental farmer.  These hay bales were not placed at the southern edge of the original soil ridge, but were placed by Plaintiffs to provide sufficient distance to prevent further damage to tree branches/roots.

319.      In a series of correspondence, Plaintiffs' Attorney asserted the doctrine of adverse possession under 735 ILCS 5/13-101, stating that the Beckers' sole use and maintenance of the soil ridge for more than 20 years constituted their ownership of the soil ridge under the Illinois doctrine of adverse possession.  *See* Exhibit F, Affidavit of Attorney James Chesloe.

320.     After the Beckers' attorney's correspondence, the adjoining landowners acquiesced to the Beckers' claim of ownership of the soil ridge under the doctrine of adverse possession and took no legal action to challenge the Beckers' use, beautification, and maintenance of this soil ridge during the remaining duration of their property ownership, which spanned another twenty-one (21) years.  *See* Exhibit F, Affidavit of Attorney James Chesloe.

321.     No title change was necessary other than Plaintiffs' continuous and open use of the soil ridge.

322.     At that time, to assure that future rental farmers would not encroach into the Beckers' tree line, metal stakes were added by Plaintiffs south of the hay bales.  *See* <u>Exhibit E</u>, bottom right photo.

323.      Fifteen (15) of these monument stakes remained in place for the next twenty-seven (27) years.

324.     This 631-foot soil ridge, which sits in Bryce 235A hydric wetland soil, with a portion adjacent to an inventoried wetland, has little monetary value, other than providing the Becker farm with an established privacy barrier, fruit trees, and flowers.

325.     The Beckers' beautification and maintenance of the soil ridge has continued to the present day, including plantings, harvesting fruit and flowers, seasonal pruning, clearing of fallen branches, drainage management, and the hiring of a tree service for large tree pruning and dead tree removal.

326.     By September 2014, a second twenty-year cycle of the Beckers' ownership of the soil ridge by adverse possession had accrued.

327.     At least by 2014, one twenty-year cycle of adverse possession had accrued concerning the Plaintiffs' maintenance of the neighbor's trees and bushes along the Beckers' 1,300-foot driveway, extending west 10-15-feet into the neighbor's property.

**<u>Defendant Brian Parker Buys Land Adjoining Becker Farm</u>**

328.     During the Summer of 2017, Plaintiff Thomas Becker spoke with surveyors for the adjoining property and provided the location of the Becker farm's SW corner monument, with a surveyor confirming it had been located below ground.

329.     When Plaintiff Thomas Becker inquired why a nail was placed on one of the

Beckers' trees near the soil ridge on Plaintiffs' property, the surveyor assured him that the mark was solely a north/south sightline, and not a property corner.

330.     Plaintiffs later discovered that this 2017 plat survey failed to follow boundary survey standards, as it did not include Plaintiffs' historic corner monument in relation to surveyed lines, did not include Plaintiffs' 15 soil ridge monument stakes in relation to said boundary line, used the nail in Plaintiffs' tree as a property corner, and the surveyor never requested the Beckers' previous surveys.

331.     During the late Summer of 2017, while Plaintiffs were pruning along the soil ridge, Defendant Brian Parker and his son introduced themselves as their new neighbors.

332.     Defendant Parker was now the fourth owner of acreage adjoining the south boundary of Plaintiffs' farm since the Beckers moved there in 1974.

333.     During that conversation, Plaintiffs cautioned Parker to be careful of the metal stakes nestled among the trees, and that they care for the soil ridge under the doctrine of adverse possession.

334.     On April 12, 2019, while Parker was removing trees/bushes near the driveway entrances with a rotary brush cutter, Plaintiffs' historic iron pipe identifying the west boundary line of their farm at Plaintiffs' driveway entrance was removed by Parker, and this pipe was observed laying on the ground.

335.     On July 14, August 14, and November 21, 2022, Plaintiffs hired a tree service with a bucket truck to remove large dead trees and to prune large trees on the Beckers' soil ridge.

336.     Due to three different days of loud chain-sawing and bucket truck operation, in full view of neighboring properties, Defendant Parker made no complaints or objections to

Plaintiffs' ongoing maintenance of the soil ridge.

337.     Throughout 2023, Plaintiffs engaged in their routine and open use, maintenance, and enjoyment of the soil ridge on the southside of their farm, including gathering flowers for bouquets, collecting apples, brush-cutting the grass to trim the area, removal of invasive saplings, clean-up of dead/fallen branches, and pruning of bushes and trees.

338.      On October 23, 2023, Plaintiff Tom Becker caught Defendant Parker in the southwest corner of Plaintiffs' property, near the area of the Beckers' SW corner monument of their farm.

**Plaintiffs Remind Defendant Parker of Their Adverse Possession of Soil Ridge**

339.     That night, Plaintiff Steve Becker sent Defendant Parker an email reminding him of Plaintiffs' adverse possession of the soil ridge along his adjoining properties.

340.     In that October 23, 2023 email, Plaintiff Steve Becker informed Parker: "In the 1970s, we began planting and maintaining the soil ridge between the properties with the mutual agreement of the prior property owners.  In 1996, after a rental farmer attempted to eliminate the tree line, our attorney asserted adverse possession in order to preserve the boundary trees and bushes.  At that time, the property owners conceded to our adverse possession, and we marked the area being encroached upon by the rental farmer with metal stakes, which remain to this day."

341.     In that same October 23, 2023 email, Plaintiff noted that Parker's surveyor had wrapped a pink ribbon around a maple tree on the Plaintiff's property, but at the time of the previous survey in June 2017, that survey company "specifically informed us that this tree marker was not the property line boundary."

342. Plaintiff's October 23, 2023 email informed Parker: "Importantly, as stated above, we already have adverse possession of this tree line, as our use and care has existed now for almost half a century. This includes both the trees and bushes north of the metal stakes, as well as those south of the stakes. Conducting a new survey does nothing to change this fact. You are on legal notice that any further trespass or attempt to alter, damage or remove any trees/bushes on this property line will result in legal action. If you do not understand the legal significance of the doctrine of adverse possession, please contact an attorney, who can explain it to you. Should you have any questions regarding our tree line boundary, please have your legal representative contact us."

343. Neither Defendant Parker nor his representative responded to Steve Becker's email, did not engage in any due diligence to request documentation confirming the Beckers' ownership of the soil ridge by adverse possession, nor did they proceed with a court action to quiet Parker's title regarding any portion of the soil ridge.

**Parker Defendants Stake and Rope Off Soil Ridge as their Property**

344. On October 27, 2023, Defendant Parker began pounding 6-foot metal T-bars along the north side of the soil ridge on Plaintiffs' farm and on Plaintiffs' legally-described property.

345. At that time, Plaintiffs Tom and Jeff Becker told Parker that the line he was staking was completely wrong, and that he was trespassing on Plaintiffs' land.

346. That day, Defendant Parker claimed to Plaintiffs that his metal T-Bar fence posts were surveyor stakes, that he would call the Sheriff if Plaintiffs crossed his new line, and that Plaintiffs would be fined $250 for each stake they removed.

347.     Plaintiffs Tom and Jeff Becker immediately noticed that Parkers' new line was devoid of any surveyed lathes, flags, spray-paint ground markings, or property corner markers establishing a legitimate boundary line by a professional surveyor.

348.     That day, when Plaintiff Tom Becker told Defendant Parker that this soil ridge is the Plaintiffs' property, Parker responded that "you organized the neighborhood against my business, how do you like something being taken from you?  If you want it back, go ahead and sue me."  Defendant Parker added that Plaintiffs cost him time and money, and now he was going to waste their time and money.

349.     When Plaintiff Tom Becker asked Parker if he had installed a camera on Plaintiffs' property, he responded, "You did it to me, how do you like being photographed?"

350.     Defendant Parker also told Plaintiffs Tom and Jeff Becker that he had seen the Parker Concrete truck photos Plaintiffs had taken, and said that their photos were illegal and unusable, as Plaintiffs took the photos while standing on his land, referring to the soil ridge.

351.     Later that afternoon Defendant Parker, along with his adult daughter, Aubrey Parker, continued to add stakes and cordoned off as theirs almost every mature tree on the Beckers' soil ridge, as well as land that is on the Beckers' legally-described property.

352.     At that time, Plaintiffs approached the Parker Defendants and informed them that they were trespassing, that Plaintiffs owned the soil ridge by adverse possession, and that no monument stakes, trees, bushes could be removed until the matter was resolved.

**Parker Defendants Impersonate Surveyors in Taking Plaintiffs' Land**

353.     On October 27, 2023, Defendant Parker refused to provide Plaintiffs with the name of his surveyor.

354. The Parker Defendants were impersonating surveyors, as the line they staked that day along Plaintiffs' 631-foot soil ridge is visibly diagonal and erratic, and the distances between stakes had no uniformity, as would have occurred with placement by a professional survey company.

355. Likewise, the Parker Defendants impersonated surveyors when they staked a line along the 1,360-foot west boundary of Plaintiffs' driveway, as said line was also devoid of any surveyed lathes, flags, spray-paint ground markings, or property corner markers identifying a legitimate boundary line created by a professional surveyor.

356. The Parker Defendants' line along Plaintiffs' driveway was also visibly erratic by sightline and, as detailed below, lacked the 50-foot spacing uniformity in distance, as would be measured by a professional survey company.

357. Prior to Defendant Parker's staked line on October 27, 2023, Defendant Parker made no objection to Plaintiffs' seasonal maintenance of 10-15-feet of trees and bushes westward into the neighboring property along Plaintiffs' driveway.

**Defendants Continue to Trespass on Plaintiffs' Property**

358. On October 28, 2023, the Parker Defendants and an unknown adult male appeared at their newly staked line on the Becker farm and were told by Plaintiffs that they were trespassing and were not to damage or remove any monument stakes, trees, or bushes until the matter was resolved in court.

359. That afternoon, Defendant Parker returned to trespass an additional five times along his newly staked line on Plaintiffs' soil ridge. Defendant Parker's five appearances were linked to his use of a hidden surveillance camera he placed on the Beckers' property, so he could

appear within minutes of when Plaintiffs went outdoors.

360.    On October 29, 2023, when Plaintiffs Tom and Jeff Becker went outside, Parker again appeared within minutes, this time with three additional people.

**Defendant Parker Continues Retaliation Against Plaintiffs**

361.    During the following week, Plaintiffs noticed that objects had been placed on or stolen from their farm, sending a message to Plaintiffs that someone could freely trespass into the interior of their property.

362.    That same week, Plaintiffs realized that they were under both camera and drone surveillance by the Parker Defendants.

363.    On November 4, 2023, Defendant Parker began damaging trees and bushes on the Beckers' soil ridge with a skid steer and axe.

364.    On the morning of November 5, 2023, Plaintiff Jeff Becker observed that Defendant Parker had removed 13 of the 15 adverse possession monument stakes, placed by the Plaintiffs on the soil ridge in the 1990s.

365.    That same day, Parker was observed again trespassing on Plaintiffs' soil ridge, hacking the Beckers' bushes with an axe, and planting a group of small evergreens on the Beckers' soil ridge.

366.    Later that afternoon, Defendant Parker was again seen trespassing on the Beckers' soil ridge, this time wrapping a chain around the bases of Plaintiffs' bushes, pulling them out by their roots with a pick-up truck, as well as hacking the roots with an axe.

367.    On November 5, 2023, while holding an axe, Defendant Parker threatened Plaintiff Jeff Becker that if he crossed Parker's new boundary line, he would "teach you a thing

or two."

368.    On that same afternoon, Plaintiff Jeff Becker also observed Defendant Parker removing one of the two remaining monument stakes on the Beckers' soil ridge, pumping the stake above his head after removing it, as if it were a trophy.

369.    On or about November 6, 2023, when Plaintiff Steve Becker contacted Parker's survey company, Community Survey, Inc., said employee informed Steve Becker that Community Survey had not been hired to stake measurement lines along Parker's property and they do not use metal T-bars for staking property lines.

370.    On November 7, 2023, Plaintiff Thomas Becker filed in Will County an emergency stalking/no contact order complaint, which was granted.

371.    On November 14, 2023, Defendant Parker, through his attorneys, filed a motion to rehear the emergency petition on November 20, 2023.

372.    On November 20, 2023, Parker testified, under oath, as to how the approximate 1,900-feet of the Becker property line was staked on October, 27, 2023 as follows: "Q. What were you out doing on the property?  A. At 9:00 a.m., they – they met me there, the two surveyors.  And then – and then Aubrey met me at the house.  And we went out.  And we – we started at 9:00 along my north boarder [sic] and we put marks – the surveyor put marks every 50 feet.  And after then after – after we got done with that, we moved to the east side.  And he put marks every 50 feet along to the east side of my property.  Q. What did the surveyor use to mark the property?  A. Just their tools.  They're – I don't – I – Q. Can you describe what it looks like? Is it a little flag?  A. It's on a transom.  It's got, you know – it – you know, they – they look through it and set it.  And then it's got some digital – I really don't know much about."

373.     Despite Defendant Parker's claims under oath that the border line along the Becker farm was staked in 50-foot increments by the precision tools of a surveyor, the erratic distances of 45-61 feet between stakes do not evidence the 50-foot increments of a professional survey company.

374.     On information and belief, this new boundary line was the amateur invention of the Parker Defendants, who were impersonating surveyors.

375.     At that same November 20, 2023 hearing, Defendant Parker also testified that the photographs taken by the Plaintiffs of Parker Concrete truck activity were taken while standing on Parker's land indicating the photos "came from my north boarder [sic] on my hay field."

**Plaintiffs Discover their Historic SW Corner Monument Had Been Removed**

376.     In February 2024, Plaintiff Steve Becker contacted Parker's attorneys about upcoming survey field work regarding the Beckers' soil ridge and driveway, and Parker's attorneys responded that Parker had no issues with said field work.

377.     On March 5, 2024, Plaintiffs' survey company, Chicagoland Survey, Inc., confirmed that the historic SW corner iron rod of the Becker farm adjacent to Parker's field had been removed.

378.     Upon information and belief, this below-ground iron rod, which had been in place from at least 1974 to 2017 was removed by Defendant Parker, as it would have easily identified that the amateur line staked by the Parker Defendants was grossly inaccurate.

379.      This missing SW corner iron rod of the Becker farm was the second property monument delineating the Plaintiffs' farm boundaries adjacent to Parker's property that had been removed.

380.     On that same date, March 5, 2024, Plaintiff Steve Becker wrote Parker's attorney to inform him that the surveyors had begun their initial measurements and anticipated coming out the following week to do further field work.

381.     In that correspondence, Plaintiff Steve Becker also informed Parker's attorney that the historic SW corner iron rod of their farm had been removed by someone.

**Defendant Parker Files ARDC Complaint Against Plaintiff/Attorney Steve Becker**

382.     On March 7, 2024, Defendant Parker filed an Attorney Registration Disciplinary Commission (hereinafter "ARDC") complaint against his neighbor, Plaintiff Steve Becker, wanting Attorney Becker investigated for "abuse of power" for threatening Parker with litigation.

383.     Defendant Parker was seeking to have Attorney Steve Becker's license revoked by the ARDC, so that Parker could avoid the stresses of future litigation.

384.     Defendant Parker attached to his ARDC complaint as exhibits, both the Plaintiffs' statutorily required notice of intent letters to sue under the Clean Water Act and RCRA.

**Defendant Parker's Vehicular ATV Assault on Plaintiffs' Survey Team**

385.     On March 13, 2024, Plaintiffs' survey team went to Defendant Parker's house and knocked on his door prior to initiating their field work, but no one came to the door.

386.     The survey team was dressed appropriately in bright orange sweatshirts and were using bright yellow surveyor equipment, and their vehicle, parked on Plaintiff's driveway entrance, had the name/contact information of the survey company clearly visible.

387.     Based on Defendant Parker's prior testimony in the stalking/no contact case, Parker stated that he had surveillance cameras at his door and driveway, which also provide him

with phone notifications.

388.     About 11:00 a.m. that morning, one of the survey team members called Plaintiffs and asked them to come to their driveway entrance, as Defendant Parker just tried to run down a team member with his ATV.

389.     Plaintiffs Tom and Jeff Becker met the survey team at the entrance of their driveway, and said team was shaken and outraged, and asked Plaintiffs to call the police.

390.     The survey team member using the equipment told Plaintiffs that the assault was not an accident, that when he saw Parker driving towards him on an ATV, he and Parker locked eyes, and then Parker accelerated his ATV directly towards him.

391.     The survey team member repeated several times to Plaintiffs that had he not jumped out of the way, Parker would have struck him with the ATV, and instead Parker rammed their expensive survey equipment, a $40,000 Sokkia robotic tripod, knocking it to the ground and damaging it.

392.     When Plaintiffs explained to the Sheriff's deputies that Parker had given consent to the survey field work, the deputies informed them that Parker had now revoked consent. The deputies refused to generate a police report and then left.

393.     Once the deputies left, Parker returned to verbally assault the surveyor team and the Plaintiffs as they were leaving.

394.     That afternoon, the owner of Chicagoland Survey Company sent Plaintiff Tom Becker the Illinois law relating to the practice of land surveying, 225 ILCS 330/45, which states: "Entry upon adjoining land; Liability for damages. A Professional Land Surveyor, or person under his direct supervision, together with his survey party, who, in the course of making a

survey, finds it necessary to go upon the land of a party or parties other than the one for who the survey is being made is not liable for civil or criminal trespass and is liable only for actual damage done the land or property."

395.     On March 14, 2024, within one week of its submission, Defendant Parker's ARDC complaint against Plaintiff Steve Becker was summarily dismissed, without requiring Attorney Steve Becker to file any written response.

396.     On March 14, 2024, Plaintiff Steve Becker wrote Parker's attorneys that, especially in light of the fact that at least two of the Becker farm's historic property markers had been removed since Parker moved in, the surveyor company has a right to full access to Parker's property in order to perform their survey.

397.     In subsequent correspondence, Parker's attorney stated that his client would only allow survey field work on a portion of one boundary line of Parker's acreage (the soil ridge along the two properties).

398.     Between March 13-15, 2024, Plaintiffs observed the headlights of Parker's ATV at night, driving back and forth along the Plaintiffs' soil ridge near their home.

**Defendant Parker Places Metal Fence Post in Wheel Path of Plaintiffs' Private Driveway**

399.     On March 16, 2024, Plaintiff Jeff Becker left his home to attend a party and drove up his 1,600-foot rural driveway, a route he has driven to and from his home for almost 45 years.

400.     After completing the driveway curve and traveling southbound, Plaintiff Jeff Becker observed two men trespassing on his private driveway, Defendant Parker and an unknown male, who was carrying a green T-bar fence post and sledgehammer.

401.     Several minutes later, Plaintiff Jeff Becker decided to return home and while

traveling back down his driveway, he observed the two men at least 30 feet into the Becker farm, near one of the Becker farm's remaining historic corner iron property rods.

402.     As he approached, Jeff Becker observed Parker and the unknown male run across Plaintiffs' driveway and hide in the bushes west of Plaintiff's driveway.

403.     As Plaintiff Jeff Becker's car entered the driveway curve, Jeff Becker, at the last moment, swerved to the right, off the road, to avoid hitting an object in the driveway and then, as his car was heading directly towards a large pine tree, he re-corrected the swerve to avoid hitting the tree.

404.     At that time, neither Defendant Parker nor the unknown male stopped to warn Plaintiff that they had just placed an obstacle into the wheel path of Beckers' private road.

405.     Plaintiff Jeff Becker discovered that, at the corner of the driveway curve, Defendant Parker and the unknown male had, only moments before, pounded a heavy-duty 6-foot metal T-bar fence post into the SW wheel path of Plaintiffs' private gravel driveway.

406.     Parker's green metal fence post had been spray-painted white to camouflage its location on Plaintiffs' white gravel driveway, and there was also white spray-paint on the gravel near the base of Parker's metal fence post.

407.     Two non-reflective "No Trespassing" signs were attached to the post, but neither sign faced to the South, the direction for all incoming traffic from the public highway to the Becker farm.

408.     Shortly thereafter, Plaintiff Jeff Becker saw Defendant Parker and an unknown male reappear to attach rope to the metal fence post now in the wheel path of Plaintiffs' private driveway.

409.    Upon inquiry by Plaintiff Jeff Becker, the unknown male refused to provide his name or confirm that he was a surveyor.

410.    That afternoon, Plaintiff Steve Becker called the Will County Sheriff and explained to the deputy that arrived at the Becker home that Plaintiffs have lived on their farm for 50 years and that Defendant Parker's fence post was preventing their ingress and egress from their farm.

411.    The Sheriff deputy recommended that Plaintiffs immediately block off their driveway to avoid a serious accident, and said deputy later had Defendant Parker remove the fence post from the wheel path of Plaintiffs' private driveway.

412.    On March 17, 2024, at about 3:00 am, Plaintiff Jeff Becker returned home from his party, traveling down his driveway in complete darkness, as there is no lighting on the Beckers' 1,600-foot rural, private road.

413.    Without Plaintiff Jeff Becker's unexpected return home earlier in the day due to Parker's trespass, Plaintiff Jeff Becker would have returned home in the dark with no forewarning that Defendant Parker's metal fence post was in the wheel path of the Beckers' road, and he would have driven directly into it, not only causing serious vehicular damage, but also serious bodily harm or death.

414.    Defendant Parker's act of placing the metal fence post in Plaintiffs' driveway was not only a public nuisance, as it is *per se* illegal to place an obstruction in any driveway, but the camouflaging of the fence post by spray-painting it white was an intentional act by Defendant Parker to create a trap meant to cause vehicular damage and/or serious bodily harm to the Plaintiffs.

66

415.    The Parker Defendants' acts of intimidation, trespassing, and attempt to confiscate the Beckers' soil ridge, were not only done to retaliate against Plaintiffs for their opposition to the operation of Parker Concrete in their rural neighborhood, but were also driven by Defendant Parker's belief that he could destroy the evidentiary value of Plaintiffs' photographs of Parker Concrete truck washings, by claiming said photographs were inadmissible as they were taken by Plaintiffs while standing on Defendant Parker's land.

**COUNT I**
(RESOURCE CONSERVATION AND RECOVERY ACT –
Defendants Parker Concrete Placement, Inc.,
Parker Concrete Pumping Inc., and Brian Parker)

416.    Plaintiffs incorporate by reference paragraphs 1- 415.

417.    The Resource Conservation and Recovery Act (RCRA) provides for citizen suits to enforce its provisions.  *See* 42 U.S.C. § 6972(a)(1)(B).

418.    Beginning in 2019 and continuing up until at least April 2023, the Defendants generated solid or hazardous waste in the form of a toxic slurry of heavy metals, including the water-soluble carcinogen Chromium 6 (Hexavalent Chromium), by conducting hundreds of lengthy washings of concrete pump trucks at 7608 W. Monee-Manhattan Road, Monee, IL 60449, contributed to the disposal of such solid or hazardous waste by dumping it directly into the soil and groundwater at said location, which is directly over a shallow sand and gravel aquifer that provides local drinking water, without any necessary washing facilities, lined containers, or mitigation measures, and this solid or hazardous waste may present an imminent and substantial endangerment to health and the environment, as Chromium 6, once introduced into human cells, can manifest in cellular instability and cancer, and such toxic slurry can leach

into the soil, inhibit plant growth, pollute stormwater, harm aquatic life, and contaminate drinking water supplies.

419.	On January 7, 2024, the Plaintiffs served upon the aforementioned Defendants a Notice of Intent to Sue letter under the RCRA pursuant to 42 U.S.C. § 6972(b)(2)(A).

420.	More than ninety days have now elapsed since the Notice of Intent letter was issued and, to the Plaintiffs' knowledge, no agency has intervened in this matter to conduct forensic testing, or otherwise remedied the violations.

421.	As a consequence of Defendants' violations of the RCRA, the Plaintiffs seek mandatory injunctive relief to order the Defendants to clean up the site, as well as the aquifer, and to attend to the proper disposal of such solid or hazardous waste, a prohibitory injunction to prevent further violations of the RCRA, the imposition of any applicable civil penalties and fines against the Defendants for past and present conduct, and for reasonable attorneys' fees and costs.

### COUNT II
(STATE CLAIM – INTENTIONAL TRESSPASS –
Defendants Parker Concrete Placement, Inc.,
Parker Concrete Pumping Inc., and Brian Parker)

422.	Plaintiffs incorporate by reference paragraphs 1- 415.

423.	The Plaintiffs maintain an actual and exclusive possessory interest in their property.

424.	The Defendants intentionally invaded Plaintiffs' exclusive possession and condition of their land.

425.	The Defendants wrongfully interfered with and continue to interfere with Plaintiffs' possessory rights through contaminating their land by dumping solid or hazardous waste onto Plaintiffs' property through stormwater runoff from the Defendants' illegal disposal

site downhill directly onto Plaintiffs' farm and gardens, through introducing solid or hazardous waste into the soil and groundwater, and through polluting the Plaintiffs' water supply by disposing of solid or hazardous waste directly above the local shallow sand and gravel aquifer from which Plaintiffs obtain their drinking water.

426.     The Defendants' intrusions subtract from the Plaintiffs' use of their property.

427.     Defendants' actions and omissions directly and proximately caused the injuries to Plaintiffs and their property, including actual and punitive damages for the environmental contamination of Plaintiffs' property, the denial of the use and enjoyment of Plaintiffs' property, the destruction of the organic status of Plaintiffs' property, emotional trauma, mental distress, and anguish over the prospect of obtaining cancer or other fatal, serious irreversible, or incapacitating reversible illnesses due to the poisoning of their drinking water, which the Plaintiffs also use for gardening and for food they grow on their farm and consume, and costs, interest, and attorney's fees.

## COUNT III
(STATE CLAIM – NEGLIGENT TRESSPASS –
Defendants Parker Concrete Placement, Inc.,
Parker Concrete Pumping Inc., and Brian Parker)

428.     Plaintiffs incorporate by reference paragraphs 1- 415.

429.     The Plaintiffs maintain an actual and exclusive possessory interest in their property.

430.     The Defendants negligently invaded Plaintiffs' exclusive possession and condition of their land.

431.     The Defendants wrongfully interfered with and continue to interfere with Plaintiffs' possessory rights through contaminating their land by dumping solid or hazardous

69

waste onto Plaintiffs' property through stormwater runoff from the Defendants' illegal disposal site downhill directly onto Plaintiffs' farm and gardens, through introducing solid or hazardous waste into the soil and groundwater, and through polluting the Plaintiffs' water supply by disposing of solid or hazardous waste directly above the local shallow sand and gravel aquifer from which Plaintiffs obtain their drinking water.

432.    The Defendants owed a duty of care to Plaintiffs not to interfere with the exclusive possession of their property.

433.    The injuries would not have occurred but for the Defendants' conduct, and/or the Defendants' course of conduct was a substantial factor in bringing about the complained-of harm.

434.    The Defendants' course of conduct created a foreseeable risk of injury to Plaintiffs and their property.

435.    The law imposed upon the Defendants an obligation of reasonable conduct for the benefit of the Plaintiffs and their property.

436.    The Defendants breached their duty.

437.    Defendants' actions and omissions directly and proximately caused the injuries to Plaintiffs and their property, including actual and punitive damages for the environmental contamination of Plaintiffs' property, the denial of the use and enjoyment of Plaintiffs' property, the destruction of the organic status of Plaintiffs' property, emotional trauma, mental distress, and anguish over the prospect of obtaining cancer or other fatal, serious irreversible, or incapacitating reversible illnesses due to the poisoning of their drinking water, which the Plaintiffs also use for gardening and for food they grow on their farm and consume, and costs,

70

interest, and attorney's fees.

## COUNT IV
### (STATE CLAIM – INTENTIONAL NUISANCE –
Defendants Parker Concrete Placement, Inc.,
Parker Concrete Pumping Inc., and Brian Parker)

438.     Plaintiffs incorporate by reference paragraphs 1- 415.

439.     The Plaintiffs maintain an actual and exclusive possessory interest in their

property.

440.     The Defendants intentionally invaded Plaintiffs' interest in the private use and

enjoyment of their land.

441.     The Defendants substantially interfered with and continue to substantially

interfere with Plaintiffs' use and enjoyment of their land by contaminating their land by dumping

solid or hazardous waste onto Plaintiffs' property through stormwater runoff from the

Defendants' illegal disposal site downhill directly onto Plaintiffs' farm and gardens, through

introducing solid or hazardous waste into the soil and groundwater, and through polluting the

Plaintiffs' water supply by disposing of solid or hazardous waste directly above the local shallow

sand and gravel aquifer from which Plaintiffs obtain their drinking water.

442.     The Defendants' intrusions are unreasonable.

443.     Defendants' actions and omissions directly and proximately caused the injuries to

Plaintiffs and their property, including actual and punitive damages for the environmental

contamination of Plaintiffs' property, the denial of the use and enjoyment of Plaintiffs' property,

the destruction of the organic status of Plaintiffs' property, emotional trauma, mental distress,

and anguish over the prospect of obtaining cancer or other fatal, serious irreversible, or

incapacitating reversible illnesses due to the poisoning of their drinking water, which the

Plaintiffs also use for gardening and for food they grow on their farm and consume, and costs, interest, and attorney's fees.

**COUNT V**
(STATE CLAIM – NEGLIGENT NUISANCE –
Defendants Parker Concrete Placement, Inc.,
Parker Concrete Pumping Inc., and Brian Parker)

444.     Plaintiffs incorporate by reference paragraphs 1- 415.

445.     The Plaintiffs maintain an actual and exclusive possessory interest in their property.

446.     The Defendants negligently invaded Plaintiffs' interest in the private use and enjoyment of their land.

447.     The Defendants substantially interfered with and continue to substantially interfere with Plaintiffs' use and enjoyment of their land by contaminating their land by dumping solid or hazardous waste onto Plaintiffs' property through stormwater runoff from the Defendants' illegal disposal site downhill directly onto Plaintiffs' farm and gardens, through introducing solid or hazardous waste into the soil and groundwater, and through polluting the Plaintiffs' water supply by disposing of solid or hazardous waste directly above the local shallow sand and gravel aquifer from which Plaintiffs obtain their drinking water.

448.     The Defendants' intrusions are unreasonable.

449.     The Defendants owed a duty of care to Plaintiffs not to interfere with the use and enjoyment of their property.

450.     The injuries would not have occurred but for the Defendants' conduct, and/or the Defendants' course of conduct was a substantial factor in bringing about the complained-of harm.

72

451.     The Defendants' course of conduct created a foreseeable risk of injury to Plaintiffs and their property.

452.     The law imposed upon the Defendants an obligation of reasonable conduct for the benefit of the Plaintiffs and their property.

453.     The Defendants breached their duty.

454.     Defendants' actions and omissions directly and proximately caused the injuries to Plaintiffs and their property, including actual and punitive damages for the environmental contamination of Plaintiffs' property, the denial of the use and enjoyment of Plaintiffs' property, the destruction of the organic status of Plaintiffs' property, emotional trauma, mental distress, and anguish over the prospect of obtaining cancer or other fatal, serious irreversible, or incapacitating reversible illnesses due to the poisoning of their drinking water, which the Plaintiffs also use for gardening and for food they grow on their farm and consume, and costs, interest, and attorney's fees.

## COUNT VI
### (STATE CLAIM – ADJACENT LANDOWNER LIABILITY –
Defendant Brian Parker)

455.     Plaintiffs incorporate by reference paragraphs 1- 415.

456.     The Plaintiffs maintain an actual and exclusive possessory interest in their property.

457.     The Defendant is the owner of the dominant property adjacent to Plaintiffs' parcel.

458.     The Defendant negligently invaded Plaintiffs' exclusive possession, use, and enjoyment of their property.

459.     The Defendant wrongfully interfered with and continues to interfere with Plaintiffs' possessory rights, use, and enjoyment of their land by contaminating their land by dumping solid or hazardous waste onto Plaintiffs' property through stormwater runoff from the Defendant's illegal disposal site downhill directly onto Plaintiffs' farm and gardens, through introducing solid or hazardous waste into the soil and groundwater, and through polluting the Plaintiffs' water supply by disposing of solid or hazardous waste directly above the local shallow sand and gravel aquifer from which Plaintiffs obtain their drinking water.

460.     The aforementioned contamination is not a natural condition of the land and/or has been artificially aggravated by the Defendant's use of his land by generating solid or hazardous waste in the form of a toxic slurry of heavy metals, including the water-soluble carcinogen Chromium 6 (Hexavalent Chromium), by conducting hundreds of lengthy washings of concrete pump trucks and contributing to the disposal of such solid or hazardous waste by dumping it directly into the soil and groundwater at said location, which is directly over a sand and gravel aquifer that provides local drinking water, without any necessary washing facilities, lined containers, or mitigation measures.

461.     The Defendant owed a duty of care to Plaintiffs not to interfere with the exclusive possession, use, and enjoyment of their property.

462.     The injuries would not have occurred but for the Defendant's conduct, and/or the Defendant's course of conduct was a substantial factor in bringing about the complained-of harm.

463.     The Defendant's course of conduct created a foreseeable risk of injury to Plaintiffs and their property.

464.     The law imposed upon the Defendant an obligation of reasonable conduct for the benefit of the Plaintiffs and their property.

465.     The Defendant breached his duty.

466.     Defendant's actions and omissions directly and proximately caused the injuries to Plaintiffs and their property, including actual and punitive damages for the environmental contamination of Plaintiffs' property, the denial of the use and enjoyment of Plaintiffs' property, the destruction of the organic status of Plaintiffs' property, emotional trauma, mental distress, and anguish over the prospect of obtaining cancer or other fatal, serious irreversible, or incapacitating reversible illnesses due to the poisoning of their drinking water, which the Plaintiffs also use for gardening and for food they grow on their farm and consume, and costs, interest, and attorney's fees.

**COUNT VII**
(STATE CLAIM – CIVIL CONSPIRACY –
Defendants Brian Parker and Aubrey Parker)

467.     Plaintiffs incorporate by reference paragraphs 1- 415.

468.     The Defendants reached an agreement to steal Plaintiffs' real property in an effort to eliminate evidence of Parker Concrete's illegal disposal activities, in retaliation for Plaintiffs successfully opposing Defendant Parker's efforts to set up an industrial concrete business in their rural residential neighborhood, and in response to Plaintiffs issuing notices of intent to sue the Defendants for said illegal activities.

469.     The Defendants committed acts in furtherance of the conspiracy, including removing historic iron rods on Plaintiffs' property, impersonating a surveyor, repeatedly trespassing on Plaintiffs' land, threatening Plaintiffs with criminal arrest, removing monument

markers, cutting down Plaintiffs' trees and shrubbery, illegally monitoring Plaintiffs' activities on their private land, conducting surveillance over Plaintiffs' private property by use of an aerial drone, stalking Plaintiffs, threatening Plaintiffs with an axe, attempting to physically run over one of Plaintiffs' surveyors with an ATV while the surveyor team was in the process of conducting a professional survey, attempting to have Plaintiff Steven Becker's law license revoked so that he would not be able to file suit for the aforementioned environmental violations, and placing a heavy metal stake in the wheel path of Plaintiffs' private driveway and camouflaging it to cause serious bodily injury or death to the Plaintiffs.

470.    The Defendants knowingly and intentionally participated in this common scheme to commit the aforementioned torts through a meeting of the minds.

471.    Defendants' conspiracy directly and proximately caused the injuries to Plaintiffs and their property, including actual and punitive damages for the illegal taking of Plaintiffs' property, the denial of the use and enjoyment of Plaintiffs' property, the theft of historic iron rods and monuments, destruction of trees and shrubbery, trespass, harassment, loss of privacy, intimidation, stalking, threat of bodily injury, criminal assault, emotional trauma, mental distress, and costs, interest, and attorney's fees.

## COUNT VIII
### (STATE CLAIM – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS – All Defendants)

472.    Plaintiffs incorporate by reference paragraphs 1- 415.

473.    While acting individually, jointly, and in conspiracy, Defendants caused Plaintiffs severe emotional distress by, *inter alia*:

    a.    Causing anguish over the prospect of obtaining cancer or other fatal,

serious irreversible, or incapacitating reversible illnesses due to the

poisoning of their drinking water and property;

b.      Illegally taking Plaintiffs' property;

c.      Preventing the Plaintiffs from the use and enjoyment of their property;

d.      Destroying Plaintiffs' longstanding trees and shrubbery;

e.      Stalking Plaintiffs;

f.      Threatening Plaintiffs with bodily injury; and

g.      Criminally assaulting Plaintiffs.

474.    Defendants intended to inflict severe emotional distress or knew that there was a high probability that their conduct would cause severe emotional distress.

475.    Defendants' willful and wanton conduct was extreme and outrageous.

476.    Defendants' actions and omissions directly and proximately caused injuries including but not limited to emotional damage, trauma, mental distress, and anguish, and costs, interest, and attorney's fees.


**WHEREFORE,** Plaintiffs demand a jury trial and the following relief jointly and severally against the Defendants:

a.      Mandatory and prohibitory injunctive relief under the RCRA;

b.      Imposition of applicable civil penalties and fines;

c.      Actual and compensatory damages in an amount in excess of $1,000,000 to be determined by a jury;

d.      Punitive damages against Defendants in an amount to be determined by a jury;

e.  Costs, interest, and attorney's fees;

f.  Damages for emotional trauma, mental distress, anguish; and

g.  Such other and further relief as this Court may deem just and proper.

Respectfully submitted,

/s/ Steven W. Becker
Steven W. Becker
Law Office of Steven W. Becker LLC
205 N. Michigan Ave., Suite 810
Chicago, Illinois 60601
(312) 396-4116
swbeckerlaw@gmail.com
Attorney for Plaintiffs